NATIONAL LEASED HOUSING ASSOCIATION, et al., Plaintiffs,

v.

The UNITED STATES, Defendant.

ACACIA VILLA, et al., Plaintiffs,

v.

The UNITED STATES, Defendant.

Nos. 6–87C, 324–87C, 204–88C, 90–6C and 90–9C.

United States Claims Court.

March 1, 1991.

Charles L. Edson and Harry J. Kelly, Washington, D.C., for plaintiffs Nat. Leased Housing Ass'n, et al.

Henry A. Hubschman, John F. Coverdale, and Lori A. Martin, Washington, D.C., for plaintiffs Acacia Villa, et al.

Terrence S. Hartman and John E. Kosloske, with whom were Asst. Atty. Gen. Stuart M. Gerson and David M. Cohen, Director, Washington, D.C., for defendant. Gershon M. Ratner, Howard M. Schmeltzer, and Georjan Overman, Dept. of Housing and Urban Development, of counsel.

## OPINION

ANDEWELT, Judge.

These two related cases have been consolidated for consideration of defendant's motion to dismiss. In the respective actions, plaintiffs, National Leased Housing Association and 230 present or former owners of rental housing projects, and Acacia Villa along with 58 other developers of rental housing projects, seek back rent payments for housing units rented to low income families pursuant to federal contracts. The cases are currently before the court on defendant's motion to dismiss the respective complaints for lack of subject matter jurisdiction. Defendant alleges that Section 801 of the Department of Housing and Urban Development (HUD) Reform

Act of 1989 (HUD Reform Act) repealed this court's existing jurisdiction under the Tucker Act to entertain plaintiffs' claims. For the reasons set forth below, Section 801 did not repeal this court's jurisdiction and defendant's motion to dismiss is denied.

## I.

Pursuant to Section 8 of the United States Housing Act of 1937, as amended, 42 U.S.C. § 1437f (the Housing Act), the federal government subsidizes the rents of low income individuals and families living in private buildings. Plaintiffs are private real estate developers who between 1974 and 1989 entered long-term Housing Assistance Payments Contracts (HAP contracts) with the federal government to provide housing for low income tenants pursuant to Section 8. Plaintiffs entered the HAP contracts either with HUD directly or through local public housing agencies. The contracts specify an initial rent for the Section 8 property (the contract rent) which is subject to periodic adjustments. The tenants pay a portion of the rent directly to the developers/owners and HUD pays the remainder.

The instant actions result from a dispute as to the proper calculation of the periodic rent adjustments under the HAP contracts. The HAP contracts oblige the government periodically to calculate and publish Automatic Annual Adjustment Factors (AAAFs), and plaintiffs contend that defendant is obliged to adjust the contract rent annually based on the applicable published AAAFs. Defendant bases its argument to the contrary on a contract provision entitled "Overall Limitation," which provides, in pertinent part: "Not withstanding any other provisions of this Contract, adjustments ... shall not result in material differences between the rents charged for assisted and comparable unassisted units...." Defendant contends that pursuant to the "Overall Limitation," HUD may conduct a market survey to determine the rents for comparable unassisted units and then modify the periodic rent adjustment that would otherwise result from application of the most recently published

AAAFs based on the results of that survey.

Prior to 1981, there was generally no attempt to invoke the "Overall Limitation" provision of the HAP contracts and, thus, the owners of Section 8 property received the full increase in the contract rent that resulted from application of the AAAFs. However, after 1981, certain HUD field offices began to conduct studies comparing the proposed contract rent with the rent of comparable unassisted housing in geographic proximity to the Section 8 project. In instances where HUD determined that "material differences" existed between the rents, HUD generally left the published AAAFs intact but adjusted the contract rent that would have resulted from application of the AAAFs so as to eliminate such differences. As a result, in certain instances plaintiffs received a rent increase less than the increase they otherwise would have received based on the most recently published AAAFs.

In response, plaintiffs filed the instant actions challenging HUD's calculation of the contract rent adjustments. Certain of the plaintiffs also filed suit in district court in the Ninth Circuit. In the instant complaint, plaintiffs contend that they are entitled to the full rent increases that would have resulted from application of the published AAAFs and that HUD's use of comparability studies to deny such increases violates the Housing Act, applicable regulations, and the HAP contracts. In addition, plaintiffs allege that HUD's implementation of comparability studies violates the due process clause of the Constitution, the Administrative Procedures Act (APA), and the Freedom of Information Act (FOIA).

## II.

In the district court action, the court agreed with the defendant that the "Overall Limitation" provision of the HAP contracts permitted HUD to set contract rent adjustments based directly on market surveys rather than on the published AAAFs. However, the court set aside HUD's use of comparability studies on the ground that

HUD implemented its market survey procedures in a constitutionally defective manner. *Rainer View Assocs. v. United States,* N. C83–997R (W.D.Wash., Jan. 15, 1986) (order denying defendant's motion for summary judgment and granting summary judgment for plaintiffs). On appeal, the Ninth Circuit took a different view and agreed with the plaintiffs that the "Overall Limitation" provision did not authorize HUD to use comparability studies as a basis for granting less than the full AAAFs adjustment. *Rainier View Assocs. v. United States,* 848 F.2d 988 (9th Cir. 1988), *cert. denied,* 490 U.S. 1066, 109 S.Ct. 2065, 104 L.Ed.2d 630 (1989). The Ninth Circuit interpreted the HAP contracts, in effect, as permitting HUD to choose between a market survey method and a formula method for calculating contract rent adjustments, and interpreted the reference in the HAP contracts to AAAFs as constituting HUD's choice of a formula method. Having originally chosen the formula method, the court reasoned, HUD could not later switch to basing contract rent adjustments directly on the results of market surveys. To the extent HUD took market conditions into consideration when setting the rent adjustments, HUD could not use the surveys directly but rather had to use the market condition information as a basis for adjusting the AAAFs and then set the contract rent adjustments based on the modified AAAFs. Consistent with the Ninth Circuit's decision, HUD made payments for all HAP contracts within the Ninth Circuit's jurisdiction based on the applicable AAAFs. HUD refused, however, to apply the Ninth Circuit ruling to other HAP contracts, including those contracts that are the subject of the instant actions.

### III.

■ Defendant does not dispute that this court possessed jurisdiction over the instant contract claims at the time the complaints were filed. The Tucker Act expressly grants this court jurisdiction to hear contract suits against the United States. 28 U.S.C. § 1491. Defendant contends, however, that Section 801 of the HUD Reform Act eliminated this court's Tucker Act jurisdiction over the instant actions.

Section 801 was enacted subsequent to, and at least partially in response to, the Ninth Circuit's treatment in *Rainier View* of HUD's use of comparability studies. Section 801(a), entitled "Effect of Prior Comparability Studies," initially notes that HUD's use of comparability studies has sometimes resulted in Section 8 property owners receiving lower rents than they otherwise would have received had the rent adjustment been based on the applicable AAAFs. Section 801(a) then proceeds to establish the following standard for calculating rent adjustments in such cases:

[F]or fiscal year 1980, and annually thereafter until regulations implementing this section take effect, rental adjustments shall be calculated as an amount equal to the [AAAFs] multiplied by a figure equal to the contract rent minus the amount of contract rent attributable to debt service. Upon the request of the project owner, the Secretary shall pay to the project owner the amount, if any, by which the total rental adjustment calculated under the preceding sentence exceeds the total adjustments the Secretary or appropriate State agency actually approved, except that solely for purposes of calculating retroactive payments under this subsection, in no event shall any project owner be paid an amount less than 30 percent of a figure equal to the aggregate of the [AAAFs] multiplied by the full contract rent for each year on or after fiscal year 1980, minus the sum of the rental payments the Secretary or appropriate State agency actually approved for those years. The method provided by this subsection shall be the exclusive method by which retroactive payments, whether or not requested, may be made for projects subject to this subsection for the period from fiscal year 1980 until the regulations issued under subsection (e) take effect.[1]

---

**1.** Section 801(a) applies to all comparability studies that had been performed prior to the

Clearly, Section 801 does not expressly repeal this court's Tucker Act jurisdiction to hear the instant contract actions against the United States. There is no mention in Section 801 of the Claims Court, the Tucker Act, or judicial review. Defendant contends, however, that Section 801 resulted in an implied repeal of this court's jurisdiction over the instant claims.

■ As a general matter, repeals of jurisdiction by implication are not favored, especially where, as here, the original grant of jurisdiction is specific in a statute rather than implied by the courts. *United States v. Fausto*, 484 U.S. 439, 452–53, 108 S.Ct. 668, 675–76, 98 L.Ed.2d 830 (1988) ("[I]t can be strongly presumed that Congress will specifically address language on the statute books that it wishes to change"). However, the courts have found an implied repeal of existing Tucker Act jurisdiction in those situations where the enactment of a new statute plainly demonstrates the intent, though unstated, to eliminate Tucker Act jurisdiction. *See id.* at 453–55, 108 S.Ct. at 676–77; *Harris v. United States*, 841 F.2d 1097, 1100–01 (Fed.Cir.1988) ("The Supreme Court's *Fausto* opinion teaches that ... the doctrine that repeals by implication are not favored cannot be allowed to overcome other and *plainer indications of intent*" (emphasis added).) In *Preseault v. ICC*, 494 U.S. 1, 110 S.Ct. 914, 108 L.Ed.2d 1 (1990), the Supreme Court recently rejected a claim that a particular statute withdrew a Tucker Act remedy for an alleged unconstitutional taking and stated: "Congress did not exhibit the type of 'unambiguous intention to withdraw the Tucker Act remedy,' *[Ruckelshaus v.] Monsanto [Co.]*, 467 U.S. [986,] 1019 [104 S.Ct. 2862, 2881, 81 L.Ed.2d 815] [ (1984) ], that is necessary to preclude a Tucker Act claim." 110 S.Ct. at 919.

When determining whether a statute embodies such a plain and unambiguous, though unstated, intent to repeal pre-existing Tucker Act jurisdiction, courts have

focused on the structure of the statute, including an analysis of congressional intent. For example, in *Fausto*, the Supreme Court concluded that the enactment of the Civil Service Reform Act of 1978 (CSRA) impliedly repealed Tucker Act jurisdiction over certain personnel claims by civil service employees under the Back Pay Act. But the Court concluded so only after a study of "the purpose of the CSRA, the entirety of its text, and the structure of [judicial] review that it establishes." *Fausto*, 484 U.S. at 444, 108 S.Ct. at 671. That study led the Court to conclude that Congress intended to *replace* the existing "patchwork system" over federal personnel action, of which the Tucker Act jurisdiction was a part, with "an integrated scheme of administrative and judicial review" which was set forth in detail in the CSRA. *Id.* at 445, 108 S.Ct. at 672. The Court concluded that all of the evidence, in effect, indicated "a considered congressional judgment" to eliminate the Tucker Act suit. *Id.* at 448–49, 108 S.Ct. at 673–74.

Defendant cites a series of cases, in addition to *Fausto* and *Harris*, to support the broad proposition that a remedy furnished by a precisely drawn, detailed statute preempts a more general statutory remedy. *E.g., Brown v. GSA*, 425 U.S. 820, 96 S.Ct. 1961, 48 L.Ed.2d 402 (1976); *Preiser v. Rodriguez*, 411 U.S. 475, 93 S.Ct. 1827, 36 L.Ed.2d 439 (1973); *United States v. Demko*, 385 U.S. 149, 87 S.Ct. 382, 17 L.Ed.2d 258 (1966); *Matson Navigation Co. v. United States*, 284 U.S. 352, 52 S.Ct. 162, 76 L.Ed. 336 (1932); *McClary v. United States*, 775 F.2d 280 (Fed.Cir.1985); *Fiorentino v. United States*, 221 Ct.Cl. 545, 607 F.2d 963 (1979), *cert. denied*, 444 U.S. 1083, 100 S.Ct. 1039, 62 L.Ed.2d 768 (1980); *John Muir Memorial Hospital, Inc. v. United States*, 221 Ct.Cl. 843 (1979). Defendant argues that Section 801 represents such a precisely drawn, detailed statute and, therefore, the general Tucker Act jurisdiction can no longer be invoked.

effective date of the HUD Reform Act except where litigation had already resulted in a final

judgment.

But none of the cases upon which defendant relies suggests a standard for evaluating implied repeals of Tucker Act jurisdiction that is different than the standard in *Preseault, Fausto,* or *Harris.* To the contrary, in each of those cited cases involving repeals by implication,[2] the courts reviewed the particular schemes established in the new statute for resolving legal issues and concluded, in effect, that when adopting the new statute, Congress plainly intended to repeal pre-existing judicial remedies.

For example, *Brown* involved Section 717 of the Civil Rights Act of 1964. The Supreme Court determined that Section 717 "establish[ed] complementary administrative and judicial enforcement mechanisms designed to [address] federal employment discrimination." 425 U.S. at 831, 96 S.Ct. at 1967. Those mechanisms permitted an aggrieved employee to file a civil district court action seeking review of a claim of employment discrimination, but only after the employee followed specified procedures. The procedures required the employee (1) initially to seek relief from the agency that allegedly committed the discriminatory acts, (2) to seek review at the Equal Employment Opportunity Commission (EEOC) if denied relief at the agency level, and (3) to file a district court discrimination action within 30 days of any adverse EEOC final decision. Similar to *Fausto,* the *Brown* Court found that this "careful blend of administrative and judicial enforcement powers" indicated a clear intent to preclude other possible judicial relief. *Id.* 425 U.S. at 832–33, 96 S.Ct. at 1967–68. The Court stated: "The balance, completeness, and structural integrity of § 717 are inconsistent with the petitioner's contention that the judicial remedy afforded by § 717(c) was designed merely to supplant other putative judicial relief." The Court concluded that Congress intended Section 717 "to create an exclusive, pre-emptive administrative and judicial scheme for the redress of federal employment discrimination." *Id.* at 829, 96 S.Ct. at 1966.[3]

2. *Demko* did not involve a repeal of jurisdiction by implication. It involved a work-related injury covered by a compensation statute that created an administrative scheme for recovery. The issue therein was whether the Federal Tort Claims Act, enacted subsequent to the compensation statute, gave the plaintiff an *alternative* route for recovery. Relying on a series of its prior opinions, the Supreme Court concluded that it did not. The Court stated that "compensation laws are practically always thought of as substitutes for, not supplements to, common-law tort actions" and, therefore, there is a general rule that the remedy given an injured worker under compensation laws is "exclusive." 385 U.S. at 151, 87 S.Ct. at 383. The Court noted that there was no indication in the subsequently adopted Federal Tort Claims Act of any "congressional purpose to make the compensation statute ... non-exclusive." *Id.* at 152, 87 S.Ct. at 384. Hence, consistent with the standard invoked above, the Court demanded plain indications in the subsequent legislation that Congress intended to modify a previously existing scheme for dispute resolution.

3. Other cases relied upon by defendant involved similar plain indications that Congress intended subsequent legislation to pre-empt a previously available cause of action. In *Preiser,* the Supreme Court held that a prisoner had to resort to habeas corpus and could not bring suit under the Civil Rights Act of 1871, 42 U.S.C. § 1983, to contest the constitutionality of the duration of imprisonment. The Court discussed issues of federal-state comity and concluded that when Congress amended the habeas corpus laws in 1948, it clearly required exhaustion of adequate state remedies prior to invocation of federal judicial relief. To permit prisoners to raise such constitutional issues under the Civil Rights Act "would wholly frustrate explicit congressional intent." 411 U.S. at 489–90, 93 S.Ct. at 1836. In *John Muir Memorial Hospital* and *Fiorentino,* like *Fausto* and *Brown,* the subsequently enacted statutes specifically provided for judicial review in a court other than the Claims Court but only after exhaustion of a particularized administrative process. *Harris* and *McClary,* both like *Fausto,* involved the preemptive effect of the CSRA.

The issue in *Matson* was whether the plaintiff's claim should be classified as a maritime claim. Once the Court concluded that it should, relying on *United States Shipping Bd. Emergency Fleet Corp. v. Rosenberg Bros. & Co.,* 276 U.S. 202, 48 S.Ct. 256, 72 L.Ed. 531 (1928), the Court held that the Suits in Admiralty Act of March 9, 1920, precluded bringing the suit in the Claims Court. In *Rosenberg,* the Court had reviewed the structure and legislative history of the Suits in Admiralty Act and concluded that it was intended to furnish the exclusive remedy in maritime cases with all suits being commenced in the district court. The *Rosenberg* Court noted that the Suits in Admiralty Act furnished "a complete system of administration, applying to the United States and the corporations alike, by which uniformity is established as to venue,

Herein, the structure and legislative history of Section 801 demonstrate no equivalent plain intent to preclude a Tucker Act breach of contract suit here. Section 801 does not establish a balanced and integrated administrative and judicial scheme to replace pre-existing review of HAP contract actions under the Tucker Act. Section 801 has no comprehensive administrative structure involving enforcement powers and makes no reference to judicial review. Rather, Section 801 merely establishes an arithmetic formula for calculating rent adjustments that certain property owners with HAP contracts should receive. ("[R]ental adjustments shall be calculated as an amount equal to the [AAAFs] multiplied by a figure equal to the contract rent minus the amount of contract rent attributable to debt service." Retroactive payments shall not be "less than 30 percent of a figure equal to the aggregate of the [AAAFs] multiplied by the full contract rent ... minus the sum of the rental payments ... approved for those years.") Clearly, the formula was intended to affect the amount of damages potentially available in a contract action brought under the Tucker Act. Congress specified that "[t]he method provided by [Section 801(a)] shall be the *exclusive method* by which retroactive payments, whether or not requested, may be made" (emphasis added). But providing that the particular method for calculating contract rent adjustments is "exclusive" says nothing about the forum in which those calculations can be made. Stated in another way, Congress unequivocably intended to place a ceiling on the amount of money a plaintiff could secure in a contract action challenging HUD's use of

comparability studies in setting periodic rent adjustments, *i.e.,* Congress intended to affect the remedy available. But there is no plain indication in Section 801 that Congress also intended to affect the forum in which that remedy could be sought.[4]

Indeed, there is no suggestion in Section 801 that Congress even considered the issue of judicial review, much less that it decided to modify the *status quo.* Section 801 was part of a broad set of statutory changes embodied in the HUD Reform Act. Throughout the Act, Congress addressed a variety of agency decisions and specifically addressed both the administrative process that would be employed and judicial review procedures. *See, e.g.,* Sections 102, 103, and 107–112. Since Congress described applicable judicial review procedures where it deemed appropriate, the absence of any mention of judicial review in Section 801 suggests an intent to maintain the *status quo* for HAP contracts.

Moreover, defendant does not contest that Congress envisioned some court review of HUD's application of the statutory formula. Rather, defendant contends that instead of *de novo* review in this court in a breach of contract action, Congress envisioned review only in district court under the "arbitrary and capricious" review standard of the APA. 5 U.S.C. § 706(2)(A). But the HUD Reform Act was adopted, in part, in response to considerable publicity concerning allegations of mismanagement and fraud by HUD officials. *See, e.g.,* 135 Cong.Rec. S. 16601 (Daily Ed. Nov. 21, 1989). In this context, absent some clear contrary indication, it would not be appropriate to imply a congressional intention to

---

service of process, rules of decision and procedure, [and] rate of interest." Moreover, the Suits in Admiralty Act specifically repealed "the provisions of all other Acts" inconsistent with it. *Id.* at 213–14, 48 S.Ct. at 258.

4. Defendant argues, in effect, that plaintiffs failed to satisfy the prerequisites for receiving the monies allowed under Section 801 because plaintiffs failed to request payment under the statute from the Secretary ("Upon the request of the project owner, the Secretary shall pay the project owner ..."). But prior to initiation of this litigation, plaintiffs requested rent payments under the HAP contracts in amounts far

in excess of the amounts now allowable under Section 801. (Plaintiffs sought the full amount of the AAAFs.) To date, that pending request has neither been withdrawn nor satisfied and plaintiffs have not received even that portion of their request that is authorized under Section 801. The instant actions were pending when the HUD Reform Act was enacted in 1989. Section 801 reasonably should not be interpreted to require such litigants, before they are permitted to proceed with their existing suits, to make a new, additional request for the monies they previously requested. Defendant has not cited anything in the legislative history that suggests Congress intended such a result.

insulate HUD decisions from *de novo* court review. More fundamentally, however, Section 801 specifically mandates the payment of monies by HUD ("The Secretary shall pay to the project owner the amount ..."). Since the statute mandates the payment of money, this court, in any event, would have jurisdiction under the Tucker Act to review any alleged erroneous application of the statute by the Secretary that has the effect of denying plaintiffs monies due. *United States v. Testan*, 424 U.S. 392, 398, 96 S.Ct. 948, 953, 47 L.Ed.2d 114 (1976). Since this court would have Tucker Act jurisdiction to review the Secretary's implementation of Section 801, it is not reasonable to conclude that Congress intended to repeal this court's jurisdiction to review the instant actions based on its contract jurisdiction.

In sum, Section 801 was not intended to and did not eliminate this court's jurisdiction over the instant actions, which were pending at the time Section 801 was enacted. Rather, Section 801 was intended only to establish a formula to be used by the Secretary and the courts to calculate the proper contract rent adjustments.

## IV.

■ As part of their argument that Section 801 does not bar the instant actions, plaintiffs contend that Section 801 is unconstitutional and that Congress could not, consistent with the Constitution, withdraw this court's jurisdiction to consider a constitutional challenge to Section 801. But in view of this court's interpretation of Section 801 above, it is not necessary to address this constitutional issue in order to resolve defendant's motion to dismiss. However, there is one other issue that this court need not necessarily address at this time but that the court will resolve in an effort to promote a more efficient disposi-

tion of the remaining issues in this litigation. That issue, addressed at length in the parties' briefs and during oral argument, is the correctness of the Ninth Circuit's conclusion in *Rainier View* that the HAP contracts obliged HUD to set the periodic contract rent adjustments based on the most recently published AAAFs. For the reasons set forth below, this court respectfully disagrees with the Ninth Circuit's interpretation. This court concludes that the "Overall Limitation" provision of the HAP contracts permits HUD to conduct a comparability study and then modify the periodic rent adjustment that otherwise would result from application of the most recently published AAAFs based on the results of that study.[5]

In order to put the relevant contractual and statutory provisions in context, it is appropriate first to discuss the procedures HUD has employed in calculating the original contract rents and the periodic rent adjustments. HUD employs three relevant procedures. First, each year, HUD publishes in the Federal Register "Fair Market Rentals" (FMRs) for 344 different geographic areas nationwide. FMRs, calculated pursuant to Section 8(c)(2)(A) of the Housing Act, are estimates of rentals that prospective tenants, who are not receiving federal rent subsidies, would be willing and able to pay for recently completed or newly constructed dwelling units of modest design, with suitable amenities within each market area. HUD establishes FMRs for five unit sizes (*e.g.*, one bedroom, two bedroom) and five structural categories (*e.g.*, detached, semidetached). HUD sets these FMRs based on surveys of at least 12 recently constructed projects for each structural type within each market area. Once the appraisers have surveyed rents in a particular geographic area, HUD sets the FMRs by determining the 75th percentile of rent levels for that area and then trend-

---

**5.** Those plaintiffs herein who were also plaintiffs in *Rainier View* contend that as to them, the government is precluded from relitigating the issue of the proper interpretation of the "Overall Limitation" provision of the HAP contracts. Defendant disagrees and has requested an opportunity to brief the question of issue preclusion. This court will not resolve this question until after the parties have had an opportunity to submit briefs on the issue. Hence, the following discussion discloses this court's interpretation of the "Overall Limitation." It does not address the issue of whether, with respect to certain plaintiffs, defendant is precluded from relying on that interpretation.

ing the data ahead two years to reflect anticipated changes in rent levels.

HUD uses these FMRs in establishing the original contract rents but the original rents are not always equal to the FMRs. HUD's regulations provide that the original contract rents must also be "reasonable" in that they must "compare reasonably to or are below the rents of unassisted units of similar age, design and location which provide comparable amenities and services." 24 C.F.R. § 880.204(b)(1)(ii)(A) (1990). If upon conducting this "rent reasonableness" test HUD determines that the rents of comparable units are lower than the FMRs, HUD does not set the original contract rents equal to the FMRs.

The second relevant procedure for setting rents involves the formulation of the AAAFs, which HUD uses in establishing periodic adjustments to the contract rents. As with FMRs, HUD sets AAAFs for distinct geographic areas. But the number of distinct geographic areas employed for AAAFs has been less than the number employed for FMRs. For example, in 1987, HUD established distinct AAAFs only for the four census regions, the States of Alaska and Hawaii, and seventy two metropolitan areas. For each area, HUD computes AAAFs using rent and utility data from the Consumer Price Index (CPI) and Bureau of the Census American Housing Surveys (AHS).[6]

The third relevant procedure for establishing rents is the comparability study. Since 1981, HUD occasionally has used comparability studies to establish the amount of periodic adjustments to the contract rents. According to an affidavit submitted by a HUD official, the procedures to be employed in performing a comparability study were as follows. HUD field staff were to select three to five projects that were used in performing the "rent reasonableness" test when the initial contract rents were set. When original projects were not available or no longer comparable, the field staff were to use comparable projects, *i.e.*, unassisted projects located in the same geographic area of similar construction and with similar amenities and services. Once the comparable projects were selected, HUD field staff were to use acceptable appraisal techniques to adjust the rents of each comparable project so as to make the comparable projects as close as possible to the subject project. The staff were then to compare the Section 8 rent that would be charged, as adjusted by the applicable AAAFs, to the rent of the comparable units. If there was a material difference, the Section 8 rents were to be held constant or adjusted to reflect the comparable rent level.[7]

The market survey HUD uses to establish FMRs, therefore, differs from the survey it uses when performing a comparability study. *Inter alia,* the comparability

6. For example, HUD developed the 1987 AAAFs for each area as follows:
 (1) The increases in the residential rent component and the fuel and utilities component of the CPI were calculated for the 12–month period from June 1985 to June 1986; (2) a shelter rent increase factor was calculated by eliminating the effect of heating costs on the CPI residential rent component as determined by the Bureau of Labor Statistics data; (3) a gross rent factor for each of the metropolitan areas covered by the CPI and for each of the four Census Regions was calculated by weighting the shelter rent and the fuel and utility increases in accordance with updated 1980 Census State weights of these component parts of rent, as derived from 1983 AHS data; (4) Adjustment Factors for Contract Rents including the highest cost utility were calculated by adjusting the gross rent factors to reflect variations by rent range in each area based on

variations developed from 1983 national AHS data as applied to the local FMR levels; and (5) Adjustment Factors for Contract Rents excluding the highest cost utility were calculated by developing updated shelter rents from the updated gross rents, by rent ranges, and then dividing the updated shelter rents by that of the previous year.
52 Fed.Reg. 9478, 9479 (1987) (to be codified at 24 C.F.R. § 888).

7. Plaintiffs contend that HUD field offices applied inconsistent, unpredictable, and erratic procedures when assessing comparability and determining the proper amount of rent adjustments. This decision does not address the issue of the procedures actually employed by HUD but rather addresses the general issue of HUD's authority under the HAP contracts to use the results of comparability studies in the manner that it did.

study involves substantially fewer units and a smaller geographic area and is not limited to the use of recently constructed or substantially rehabilitated buildings. In addition, the comparability study sets rents based upon actual as opposed to "trended" rents.

## V.

The instant actions are contract actions and the fundamental issue before this court is one of contract interpretation, *i.e.*, whether HUD's procedures for setting the contract rent adjustments based on comparability studies are consistent with HUD's authority under the HAP contracts. A review of the pertinent contract language indicates that the HAP contracts (1) anticipate that HUD may conduct comparability studies when establishing the periodic rent adjustments and (2) oblige HUD, in appropriate circumstances, to modify the rent adjustments that otherwise would result from application of the most recently published AAAFs based on the results of those studies.

The rent adjustment provision in the HAP contracts provides, in pertinent part, as follows:

1.9 *RENT ADJUSTMENTS*

 \* \* \* \* \* \*

 b. *Automatic Annual Adjustments.*

 (1) [AAAFs] will be determined by the Government at least annually; interim revisions may be made as market conditions warrant. Such Factors and the basis for their determination will be published in the Federal Register. These published Factors will be reduced appropriately by the Government where utilities are paid directly by the Families.

 (2) On each anniversary date of the Contract, the Contract Rents shall be adjusted by applying the applicable [AAAFs] most recently published by the Government. Contract Rents may be adjusted upward or downward, as may be appropriate; however, in no case shall the adjusted Contract Rents be less than the Contract Rents on the effective date of the Contract.

 c. *Special Additional Adjustments.* Special additional adjustments shall be granted, when approved by the Government, to reflect increases in the actual and necessary expenses of owning and maintaining the Contract Units which have resulted from substantial general increases in real property taxes, utility rates, or similar costs (i.e., assessments, and utilities not covered by regulated rates), but only if and to the extent that the Owner clearly demonstrates that such general increases have caused increases in the Owner's operating costs which are not adequately compensated for by automatic annual adjustments. The Owner shall submit to the Government financial statements which clearly support the increase.

 d. *Overall Limitation.* Not withstanding any other provisions of this Contract, adjustments as provided in this Section shall not result in material differences between the rents charged for assisted and comparable unassisted units, as determined by the Government; provided, that this limitation shall not be construed to prohibit differences in rents between assisted and comparable unassisted units to the extent that such differences may have existed with respect to the initial Contract Rents.

Plaintiffs focus on paragraph 1.9b and stress the statement in paragraph 1.9b(2) that "[o]n each anniversary date of the Contract, the Contract Rents shall be adjusted by applying the applicable [AAAFs] most recently published by the Government." But, while the contract provides for adjustments under paragraph 1.9b(2) plus other "special additional adjustments" under paragraph 1.9c, the contract also renders these adjustments subject to the "Overall Limitation" in paragraph 1.9d. The wording of paragraph 1.9d is straightforward: "Not withstanding any other provisions of this Contract" rent adjustments provided in paragraph 1.9 "shall not result in material differences between the rents charged for assisted and comparable unas-

sisted units, as determined by the Government." The title "Overall Limitation" and the phrase "[n]ot withstanding any other provisions of this Contract" indicate very precisely that the limitation in paragraph 1.9d is paramount; that it overrides any other provision in the contract, including paragraphs 1.9b and 1.9c, that otherwise would result in a rent adjustment that would produce a material difference from rents charged for comparable unassisted units. Hence, the "Overall Limitation" would appear to preclude HUD's use of the most recently published AAAFs in setting the rent adjustments when the amount of such adjustments would result in such "material differences."

Other conclusions also flow from the language of paragraph 1.9. First, the "Overall Limitation" in paragraph 1.9d envisions HUD making some type of market study of comparable rents in that it refers to "rents charged for assisted and *comparable* unassisted units, *as determined by the Government*" (emphasis added). The most direct and accurate way for HUD to determine "rents charged for ... comparable units" would be to conduct some form of a survey of market rents charged for comparable units. Second, the HAP contracts do not contain any provision limiting HUD to any particular methodology for making its comparability determination. Hence, HUD is generally free to base its assessment of rents charged for "assisted and comparable unassisted units" on comparability studies that compare the particular Section 8 projects with other comparable unassisted units. Third, there is no provision in the contracts that obliges HUD to follow any particular procedure for setting the rent adjustments after it has conducted a comparability study and quantified the rents charged for comparable unassisted units. Thus, nothing in the contract language specifically obliges HUD to translate the results of a comparability study into modified AAAFs and then to set the amount of rent increases based on such AAAFs. Rather, HUD appears authorized, based upon the results of its comparability studies, to reduce directly the amount of the contract rent adjustments that otherwise would

have resulted from paragraph 1.9b so as to prevent the proscribed "material differences."

## VI.

In holding to the contrary, the Ninth Circuit did not point to any ambiguity *per se* in the wording of paragraph 1.9b. Rather, the court focused on the wording of Section 8(c)(2) of the Housing Act (42 U.S.C. § 1437f(c)(2)) because, the court concluded, paragraph 1.9 of the contracts "contains provisions designed to carry out the mandates of section 8(c)(2)." *Rainier View*, 848 F.2d at 989. Section 8(c)(2), as amended in 1974, contained Sections (A), (B), and (C), which corresponded to, but used significantly different language than, paragraphs 1.9b, 1.9c, and 1.9d of the HAP contracts. Section 8(c)(2) provided as follows:

(A) The assistance contract shall provide for adjustment annually or more frequently in the maximum monthly rents for units covered by the contract to reflect changes in the fair market rentals established in the housing area for similar types and sizes of dwelling units or, if the Secretary determines, on the basis of a reasonable formula.

(B) The contract shall further provide for the Secretary to make additional adjustments in the maximum monthly rent for units under contract to the extent he determines such adjustments are necessary to reflect increases in the actual and necessary expenses of owning and maintaining the units which have resulted from substantial general increases in real property taxes, utility rates, or similar costs which are not adequately compensated for by the adjustment in the maximum monthly rent authorized by subparagraph (A).

(C) Adjustments in the maximum rents as hereinbefore provided shall not result in material differences between the rents charged for assisted and comparable unassisted units, as determined by the Secretary.

42 U.S.C. § 1437f(c)(2) (Supp. IV 1974). The Ninth Circuit explained its conclusion that HUD could not set periodic rent increases based directly on comparability studies, as follows:

> HUD misconstrues the role of the overall limitation. The overall limitation provision in section 1.9d, consistent with its statutory analog, Section 8(c)(2)(C), is clearly a limitation on the calculation of the formula used to adjust rents, not an independent basis for making annual rent adjustments. Under the statute, HUD could choose either a market survey method (described in the first clause of Section 8(c)(2)(A)) *or* a formula method (described in the second clause of Section 8(c)(2)(A)). In the contract, HUD elected the formula method. Having made its choice, HUD cannot now change its mind. The overall limitation provision of the statute and the contract permit HUD to adjust the formula factors in light of market conditions, but it does not permit HUD to abandon entirely the formula method it chose and to adjust rents solely on the basis of a market survey. HUD's interpretation of the overall limitation provision would render the formula method authorized by the statute and elected in the contract a nullity. It would make all rent adjustments depend on the market survey method.

848 F.2d at 991 (emphasis in original).

This court respectfully declines to adopt this analysis. For the reasons set forth above, the wording of paragraph 1.9d does not support the conclusion that paragraph 1.9d "is clearly a limitation on the calculation of the formula used to adjust rents." To the contrary, the language employed therein anticipates HUD's use of comparability studies for application of the "Overall Limitation" and does not oblige HUD to translate the results of such studies into modified AAAFs when establishing the appropriate amount of the periodic rent adjustments.

It is true that Section 8(c)(2)(C) is not as clear as paragraph 1.9 with respect to implementing a comparability limitation because Section 8(c)(2)(C) does not use the phrases "Overall Limitation" or "not withstanding any other provisions of this [statute]." But there is no ambiguity in Section 8(c)(2)(C) as to HUD's authority to conduct comparability studies. As with paragraph 1.9d, Section 8(c)(2)(C) anticipates that HUD may conduct a market study in that it requires that the adjustments pursuant to Sections 8(c)(2)(A) and 8(c)(2)(B) "shall not result in material differences between the rents charged for assisted and *comparable* unassisted units, *as determined by the Secretary*" (emphasis added). As in paragraph 1.9d, there is no limitation in Section 8(c)(2)(C) precluding HUD from making its comparability determination based on a study comparing rents in a particular Section 8 project with rents charged for comparable unassisted units.

Rather, the potential ambiguity in Section 8(c)(2)(C) involves the procedures HUD must follow when comparability studies demonstrate such "material differences." The Ninth Circuit interpreted Section 8(c)(2)(C) as providing "clearly a limitation on the calculation of the formula to adjust rents" rather than a distinct basis for determining rents, and, hence, concluded that HUD's only proper response to the study was to adjust the formula. *Id.* But Section 8(c)(2)(C) does not "clearly" so provide. Section 8(c)(2)(C) can be read as providing an overall limitation that can serve as a distinct basis for setting contract rent adjustments. It simply provides "[a]djustments in the maximum rents as hereinbefore provided shall not result in material differences...." Section 8(c)(2)(C) does not unambiguously indicate that if, based on a comparability study, the Secretary determines that application of a contract formula would result in such "material differences," the Secretary is obliged to change the formula rather than simply modify the rent that would have resulted from application of the formula.[8]

---

**8.** Section 8(c)(2)(A) permits HUD to set rent adjustments either based on "a reasonable formula" or "to reflect changes in the fair market rentals established in the housing area for sim-

HUD's use of comparability studies in setting the periodic rent adjustments does not render the reference in paragraph 1.9b to the AAAFs a "nullity." It does not result in HUD "abandon[ing] completely" the AAAFs. To the contrary, the AAAFs would still have economic significance. Under HUD's interpretation of Section 8(c)(2)(C) and paragraph 1.9d, plaintiffs are entitled to the full AAAF increase unless a comparability study results in a finding that "material differences" exist between the AAAF adjusted rents and "comparable" rents. Hence, plaintiffs would be entitled to the full AAAF-based rent adjustments when a difference exists but that difference is not "material." While HUD's definition of "material" has allegedly varied over the years, the definition apparently has never been so broad as to encompass all economically significant differences. Indeed, since 1986, pursuant to a HUD memorandum, HUD has maintained that "[a] material difference exists whenever the adjusted Section 8 rent would *exceed* 120 percent times the sum of the comparable rent and the initial difference" (emphasis added). Hence, the HUD approach does not result in rent adjustments being set at the same level at which they would have been set had the contract, instead of specifying a formula method, specified the Section 8(c)(2)(A) alternative, that rent adjustment "reflect changes in fair market rentals ... for similar types ... of dwelling units." Since the AAAFs remain economically significant, the use of comparability studies does not render the paragraph 1.9b reference to the AAAFs a "nullity."

In evaluating plaintiffs' arguments, it is important to understand the very narrow nature of the issue properly in dispute here. As noted above, there is no dispute that Congress intended in Section 8(c)(2)(C) that there be no material difference between rents charged for Section 8 units and rents charged for comparable unassisted units, even when HUD establishes the Section 8 rent adjustment by reference to a formula. Section 8(c)(2)(C) is unambiguous on that point. Similarly, there can be no reasonable dispute that Section 8(c)(2)(C) contemplates HUD conducting some type of market study of comparable units in order to determine whether a particular formula produces a rent materially different from the rent of comparable unassisted

ilar types and sizes of dwelling units." Plaintiffs argue, in effect, that the fair market rental alternative is the same as setting the rent adjustments based on comparability studies and, hence, defendant's failure to select the fair market value alternative in the contract represents a binding election to use the formula method. But Section 8(c)(2)(A) does not unambiguously state that defendant must elect *at the time of the contract* whether it will base all periodic rent adjustments on a formula method *or* on changes in the fair market values of similar units. Rather, Section 8(c)(2)(A) only obliges that the contract provide for periodic adjustments by formula or by fair market value. Thus, Section 8(c)(2)(A) can be interpreted to authorize HUD to include both options in the contract and to permit HUD to elect between these options *each time a periodic adjustment is to be made.* As described above, this court interprets paragraph 1.9d of the HAP contracts as preserving HUD's option to use comparability studies in setting rent adjustments. Therefore, *to the extent that the Section 8(c)(2)(A) alternative of setting periodic adjustments by reference to fair market rentals is the same as setting the adjustments by reference to "comparable unassisted units,"* the specific reference to "comparable unassisted units" in paragraph 1.9d can be interpreted as

preserving this option, left open in Section 8(c)(2)(A), to include both alternatives in the contract.

Defendant disputes that an assessment of fair market rentals pursuant to Section 8(c)(2)(A) is the same as a comparability assessment under Section 8(c)(2)(C) and, hence, contends that HUD's failure to mention the fair market value alternative in the contracts could not possibly constitute an election not to use comparability studies. But the language of Section 8(c)(2)(A) appears on its face to be referring to what would generally be considered "comparable" units in that it refers to "fair market rentals ... in the housing area for similar types and sizes of dwelling units." In its argument to the contrary, defendant stresses that, as described above, HUD has applied different survey procedures when assessing fair market rentals and when determining comparability. In addition, defendant notes that Congress uses different language in Section 8(c)(2)(A) and Section 8(c)(2)(C). Indeed, if Congress intended the two concepts to be the same, it could have made that intent clear by using the same terminology in Section 8(c)(2)(A) and Section 8(c)(2)(C) when describing the units that are to be surveyed.

units.[9] Therefore, the crucial issue involved herein is not whether HUD was authorized to perform a market study to assess comparability and then to use the results of that study in establishing the amount of the contract rent adjustments. HUD clearly had such authority. Rather, the crucial issue is whether HUD employed a permissible methodology when it translated the results of such studies into rent adjustments, *i.e.*, whether HUD was authorized to use the results of comparability studies directly to modify the rents that would otherwise result from application of a contract formula, or whether HUD was obliged instead to translate the results of the studies into modified AAAFs and then to calculate the adjusted rents based on the modified AAAFs.

On this issue, plaintiffs have not pointed to anything in the legislative history of the Housing Act that suggests any pertinent congressional concern about the methodology that HUD would use in implementing the results of comparability studies. Moreover, the surrounding circumstances do not warrant any inference that Congress would have such a concern. The two methodologies should be expected to produce the same result. Whichever methodology is employed, the rent adjustment, in effect, would be based on the same comparability study and the amount of the rent adjustment should be the same. For example, consider a situation where HUD's comparability study indicates a comparable unit rent of $400 and the application of the most recently published AAAF would result in a

rent materially in excess of $400. Under one methodology, HUD could respond to that study by decreasing the rent adjustment that would otherwise result from the AAAF so as to establish a rent adjustment that results in a rent not materially different from $400. Under the other methodology, HUD could modify the AAAF in such a way as to get precisely the same periodic rent adjustment. For example, HUD could change the factors on which the AAAF is based, change the weighing of the factors, and/or change the geographic area with respect to which the AAAF is calculated and applied.

Not only would the choice of methodology not be expected to impact the amount of the rent increase, but also interpreting paragraph 1.9d and Section 8(c)(2)(C) to oblige a modification of the AAAFs in all cases could produce significant inefficiencies. In certain circumstances, it would be difficult and hence costly to translate the results of a single comparability study into an appropriate modification of an existing AAAF (or any formula) that is applicable to all Section 8 housing in a broad geographic area.[10] Absent clearer indications of congressional intent, this court will not impute to Congress the intent to restrict HUD's options so as to oblige HUD to take a less efficient route to reach essentially the same end result.

### VII.

■ As this court acknowledges, and as the disagreement between the district court

---

**9.** Indeed, the Ninth Circuit seemed to anticipate that such surveys would be performed. The court stated: "The overall limitation provision of the statute and the contract permit HUD to adjust the formula factors in *light of market conditions,* but it does not permit HUD to abandon entirely the formula method it chose and to adjust rents solely on the basis of a market survey." *Rainier View,* 848 F.2d at 991 (emphasis added).

**10.** As described above, HUD calculates AAAFs over broad geographic areas. But, depending upon the desirability of particular locations, rents can vary dramatically within broad geographic areas and the extent of that variance can change significantly over time. Therefore, a determination that a certain formula does not result in comparable rents for a particular Section 8 project does not mean that the same

formula does not result in comparable rents for a different Section 8 project in the same geographic area. Similarly, a change in a formula that produces comparability for one Section 8 project may result in a lack of comparability for a different Section 8 project in the same area. In this context, it could be difficult and costly for HUD to make an optimal adjustment to a formula covering a broad geographic area based on the results of one comparability study that focuses on one Section 8 project. Thus, for example, where a single comparability study indicates a material difference in rent, it may be far more efficient simply to adjust the rent of the Section 8 project directly based on that study rather than to try to modify the formula and/or narrow the geographic area to which the formula applies.

and the Ninth Circuit demonstrates, Section 8(c)(2) is not without ambiguity. But the general rule of statutory interpretation is that agencies charged with implementing a statute are given reasonable discretion in interpreting that statute. *Chevron U.S.A., Inc. v. Natural Resource Defense Council, Inc.,* 467 U.S. 837, 843, 104 S.Ct. 2778, 2781, 81 L.Ed.2d 694 (1984). Herein, for the reasons described above, HUD's interpretation of Section 8(c)(2) is reasonable. The HAP contracts are drafted in a manner consistent with that interpretation and, as explained above, permit HUD to use comparability studies directly in setting the contract rent adjustments.

■ Plaintiffs contend, in effect, that defendant's interpretation of Section 8(c)(2) after 1981 is not the same as it was before 1981. Plaintiffs point to a 1978 HUD handbook and a 1980 internal HUD memorandum each of which indicates that HUD employees should modify the AAAFs if an adjustment based on the AAAFs did not result in an appropriate rent adjustment. But there is no inherent inconsistency in HUD's position in 1978 and its subsequent direct use of comparability studies to modify the rent adjustments that would have resulted from the AAAFs. As described above, modification of the AAAFs was always one option open to HUD for assuring comparability. A second option is the modification of the AAAFs based on the findings of the comparability studies. The 1978 handbook, which was rescinded in 1981, and the 1980 memorandum each proposes the first option. But neither suggests that HUD was precluded under the controlling statute, regulations, or HAP contracts from switching to the alternative second option. Indeed, the internal memorandum upon which plaintiffs rely specifically raises the possibility of "another system" being adopted to protect project owners' interests.[11] Commencing in 1981, HUD apparently decided that, in appropriate circumstances, it would employ "another system." Thus, HUD never rejected an interpretation of the contract that permitted direct use of comparability studies to modify the rent adjustments that would result from application of the AAAFs, or even suggested that such an interpretation was not correct.

For the same general reasons, 24 C.F.R. § 888.204 (1988) does not demand a different result. It provides:

> If the application of the [AAAFs] results in rents that are substantially lower than rents charged for comparable units not receiving assistance ..., in the area for which the factor was published or a portion thereof, and it is shown to HUD that the costs of operating comparable rental housing have increased at a substantially greater rate than the Adjustment Factors, the HUD Field Office will consider establishing separate or revised [AAAFs] for that particular area.

While Section 888.204 obliges HUD to consider adjusting the AAAFs, it does not suggest that revised AAAFs are HUD's only possible response to such a comparability study. Moreover, Section 888.204 specifically applies only to situations where the AAAF calculated rents would be lower than comparable rents. It does not mention what procedures HUD must consider, much less apply, in situations, such as those involved in the instant cases, where HUD concludes that the AAAFs result in rents that would be higher than comparable rents.

Finally, support for defendant's interpretation of Section 8(c)(2)(C) can also be found in Congress's subsequent review of HUD's policy under Section 8(c)(2)(C). In

11. The 1980 memorandum recommended:
[T]he handbook should include a system for field offices to check on whether the factors are resulting in correct rent adjustments. This could include requiring field offices to conduct a random sampling every two or three years to assure that the factor is resulting in rents which are comparable. Where the sample indicates problems with the factor, steps should be taken to establish a separate factor for a market area now included in one of the broad census region categories or to correct the factor for one of the SMSAs for which an individual factor is now published on a regular basis. This or another system to assure that an owner is not being treated arbitrarily must be established if HUD is to preserve its ability to apply the overall limitation.

1988, seven years after HUD began its use of comparability studies, Congress added the following two sentences to the end of Section 8(c)(2)(C):

> If the Secretary or appropriate State agency does not complete and submit to the project owner a comparability study not later than 60 days before the anniversary date of the assistance contract under this section, the automatic annual adjustment factor shall be applied. The Secretary may not reduce the contract rents in effect on or after April 15, 1987, for newly constructed, substantially rehabilitated, or moderately rehabilitated projects assisted under this section (including projects assisted under this section as in effect prior to November 30, 1983), unless the project has been refinanced in a manner that reduces the periodic payments of the owner.

Thus, Congress did not disapprove of HUD's policy of using comparability studies directly to modify rent adjustments that would result from application of the most recently published AAAFs rather than modifying the AAAFs. Rather, Congress only expressed concern with the timing of the delivery of comparability studies. As the Supreme Court has observed, "when Congress revisits a statute giving rise to a longstanding administrative interpretation without pertinent change, the 'congressional failure to revise or repeal the agency's interpretation is persuasive evidence that the interpretation is the one intended by Congress.' *NLRB v. Bell Aerospace Co.*, 416 U.S. 267, 274–75 [94 S.Ct. 1757, 1762, 40 L.Ed.2d 134] (1974)." *Commodity Futures Trading Comm'n v. Schor*, 478 U.S. 833, 846, 106 S.Ct. 3245, 3254, 92 L.Ed.2d 675 (1986).

### Conclusion

For the reasons set forth above, Section 801 of the HUD Reform Act does not repeal this court's jurisdiction to entertain the instant contract claims. Therefore, defendant's motion to dismiss is denied.

IT IS SO ORDERED.