**NATIONAL LEASED HOUSING ASSOCIATION, et al., Plaintiffs,**

v.

**The UNITED STATES, Defendant.**

**Nos. 6–87C, 324–87C, 204–88C and 6–90C.**

United States Claims Court.

Dec. 11, 1991.

Charles L. Edson, Washington, D.C., for plaintiffs. Harry J. Kelly, of counsel.

Terrence S. Hartman, with whom were Asst. Atty. Gen. Stuart M. Gerson and David M. Cohen, Director, Washington, D.C., for defendant. Georjan Overman, Dept. of Housing and Urban Development, of counsel.

## OPINION and ORDER

ANDEWELT, Judge.

### I.

Section 8 of the United States Housing Act of 1937, as amended, 42 U.S.C. § 1437f (the Housing Act), creates a statutory scheme pursuant to which the federal government, through the Department of Housing and Urban Development (HUD), directly or indirectly subsidizes the rents of low-income individuals and families living in privately owned buildings. HUD subsidizes these rents in either of two ways. Where qualified public housing agencies exist, HUD enters annual contribution contracts with the agencies which, in turn, enter Housing Assistance Payments (HAP) contracts with property owners that guarantee the payment of rents for low income tenants. Where no such qualified public housing agencies exist, HUD enters HAP contracts directly with the property owners.[1] The HAP contracts establish an initial contract rent and provide for periodic adjustments to that contract rent.

Between 1974 and 1989, plaintiffs, National Leased Housing Association and 230 present or former owners of rental housing projects, entered long-term HAP contracts either with public housing agencies or with HUD directly. In the instant action, plaintiffs contend that HUD improperly calculated the periodic rent adjustments due under their HAP contracts and plaintiffs seek back rent payments and related equitable relief.

This court reviewed many of the pertinent contractual, statutory, and regulatory provisions in a previous order denying defendant's motion to dismiss. *National Leased Housing Ass'n v. United States*, 22 Cl.Ct. 649 (1991) (*NLHA I*). In *NLHA I*, this court rejected plaintiffs' contention that under the HAP contracts and related statutes and regulations, HUD was obliged to adjust the contract rents annually based on HUD's most recently published Automatic Annual Adjustment Factors (AAAFs). The court relied upon a contract provision entitled "Overall Limitation" which provides, in pertinent part: "Not withstanding any other provisions of this Contract, adjustments ... shall not result in material differences between the rents charged for assisted and comparable unassisted units, as determined by the Government...." The court concluded that HUD could conduct comparability studies in order to determine the rents charged for "assisted and comparable unassisted units" and then set the periodic rent adjustments based on those studies directly, rather than on the most recently published AAAFs. *Id.* at 658–59.

The instant action is presently before the court on cross-motions for partial summary judgment. In their motion, plaintiffs, once again, seek the full rent increases that would have been awarded had HUD based the rent adjustments on the most recently published AAAFs. Plaintiffs rely here, however, on different theories of government liability than those addressed in *NLHA I.* Plaintiffs' attack focuses on the procedures HUD employed when it conducted the comparability studies and established the periodic rent increases. Plaintiffs allege that those procedures constitute a breach of contract, violate plaintiffs' fifth amendment due process rights, and are inconsistent with both the comment and publication requirements of the Adminis-

---

**1.** Section 1437f(b)(1) of the Housing Act provides:

> · The Secretary is authorized to enter into annual contributions contracts with public housing agencies pursuant to which such agencies may enter into contracts to make assistance payments to owners of existing dwelling units in accordance with this sec-

tion.... In areas where no public housing agency has been organized or where the Secretary determines that a public housing agency is unable to implement the provisions of this section, the Secretary is authorized to enter into such contracts and to perform the other functions assigned to a public housing agency by this section.

trative Procedure Act, 5 U.S.C. §§ 551, 553 (the APA), and the publication requirements of the Freedom of Information Act, 5 U.S.C. § 552 (the FOIA). Plaintiffs then argue that because of these deficiencies, HUD cannot rely upon the comparability studies and instead is obliged to grant adjustments based on the applicable AAAFs. In its cross-motion, defendant seeks dismissal and/or summary judgment on all of plaintiffs' claims that are based on a violation of due process, the APA, or the FOIA.[2]

## II.

Before discussing plaintiffs' allegations that HUD violated due process, the APA, and the FOIA during its process of determining periodic rent adjustments, two threshold issues should be discussed. The first issue relates to the scope of this court's jurisdiction over the instant action and the second relates to the measure of damages potentially available to plaintiffs if they can demonstrate a breach of contract.

## A.

This court's jurisdiction is established, in pertinent part, in the Tucker Act, 28 U.S.C. § 1491(a)(1), which states, in pertinent part:

The United States Claims Court shall have jurisdiction to render judgment upon any claim against the United States founded either upon the Constitution, or any Act of Congress or any regulation of an executive department, or upon any express or implied contract with the United States, or for liquidated or unliquidated damages in cases not sounding in tort.

Plaintiffs' claims herein involve alleged violations of the Constitution (fifth amendment due process) and two acts of Congress (the APA and the FOIA). Clearly, to the extent that these alleged violations constitute breaches of the HAP contracts, this court would have jurisdiction to entertain such claims pursuant to its Tucker Act jurisdiction over express government contracts. But in the absence of a breach of contract, this court could not entertain plaintiffs' due process, APA, and FOIA claims. This court's jurisdiction over claims founded upon the Constitution or federal statutes extends only to constitutional provisions and federal statutes that "can fairly be interpreted as mandating compensation" for their violation. *United States v. Testan*, 424 U.S. 392, 400, 96 S.Ct. 948, 954, 47 L.Ed.2d 114 (1976), *quoting Eastport S.S. Corp. v. United States*, 178 Ct.Cl. 599, 607, 372 F.2d 1002, 1009 (1967). Neither the fifth amendment's due process guarantee (*Inupiat Community of Arctic Slope v. United States*, 230 Ct.Cl. 647, 662, 680 F.2d 122, 132, *cert. denied*, 459 U.S. 969, 103 S.Ct. 299, 74 L.Ed.2d 281 (1982)) nor the APA (*Peoples Apparel, Ltd. v. United States*, 226 Ct.Cl. 515, 519 n. 7, 650 F.2d 291 (1980)) are money mandating. Similarly, the pertinent terms of the FOIA[3] cannot reasonably be interpreted to mandate the federal government to make any payment of money for their violation. Hence, to prevail on their summary judgment motion, plaintiffs not only must establish their alleged violations but also must demonstrate that these violations constitute a breach of contract.

Plaintiffs contend that they can satisfy this requirement. Plaintiffs argue that, properly interpreted, the contracts obliged defendant, when assessing comparable rents, to comply with the requirements of

---

2. Other issues have been presented in the various motions which are not addressed herein but will be addressed in subsequent orders.

3. The FOIA provides, in pertinent part:

Each agency shall separately state and currently publish in the Federal Register for the guidance of the public—

\* \* \* \* \* \*

(D) substantive rules of general applicability adopted as authorized by law, and statements of general policy or interpretations of general applicability formulated and adopted by the agency; and

(E) each amendment, revision, or repeal of the foregoing.

Except to the extent that a person has actual and timely notice of the terms thereof, a person may not in any manner be required to resort to, or be adversely affected by, a matter required to be published in the Federal Register and not so published.

5 U.S.C. § 552(a)(1) (1977).

due process, the APA, and the FOIA. Plaintiffs then argue that the procedures HUD employed in assessing comparability violated each of these requirements. The court discusses the procedures HUD employed in establishing the rent increases in Section III below. The court then evaluates plaintiffs' allegations that those procedures constitute a breach of contract in Section IV (due process) and Section V (the APA and the FOIA).

### B.

The second threshold issue involves the measure of damages available to plaintiffs if they can demonstrate a breach of contract on any of the above grounds. Plaintiffs contend, in effect, that if they establish any such breach of contract, their damages necessarily would be the difference between the rents plaintiffs would have received had HUD based the periodic rent adjustments on the most recently published AAAFs and the rents plaintiffs actually received based on the comparability studies.

Plaintiffs note that although the APA and the FOIA contain no sanction for failure to comply with their terms, many cases have held that an agency action is void if taken in a manner inconsistent with APA or FOIA procedures. *See, e.g., Batterton v. Marshall,* 648 F.2d 694, 711 (D.C.Cir. 1980) ("Normally, a judicial determination of procedural defect requires invalidation of the challenged rule.") While the APA and the FOIA are silent as to what rule should be applied in the event an agency act is voided for violation of their terms, some courts have held that the most recent validly instituted rule should remain in effect. *See, e.g., Alaniz v. OPM,* 728 F.2d 1460, 1470 (Fed.Cir.1984). Plaintiffs rely upon such cases and contend that since HUD's use of comparability studies in determining rent adjustments did not accord with the APA, the FOIA, or due process, the comparability studies are void, and, therefore, the most recent validly instituted rule—the AAAFs—must be used to determine the rent increases. But plaintiffs' contention ignores a crucial provision in the HAP contracts.

The "Overall Limitation" provision in the contracts unequivocally states: "Not withstanding any other provisions of the Contract, adjustments ... shall not result in material differences between the rents charged for assisted and comparable unassisted units...." The court discussed this limitation at length in *NLHA I* and concluded that "[it] would appear to preclude HUD's use of the most recently published AAAFs in setting the rent adjustments when the amount of such adjustments would result in such 'material differences.'" 22 Cl.Ct. at 659. In determining the amount of any breach of contract damages, this preclusion should apply equally herein.

The "Overall Limitation" provision establishes the extent of plaintiffs' contractual entitlement. It provides that rent adjustments "shall not result in material differences between the rents charged for assisted and comparable unassisted units." Hence, if, as alleged here, the comparability studies were conducted improperly and in violation of the contract requirements, the solution would not be to return blindly to the AAAFs. Rather, to give effect to the "Overall Limitation," it is necessary for the court to consider the issue of comparable rents and assure that any rent that it allows is not materially different from the rents charged at the time for comparable unassisted units.

Stated in another way, assume plaintiffs are correct that the procedures HUD employed in calculating comparable rents were defective, but also assume that the process, perhaps fortuitously, ended up with a correct determination of the rents charged for comparable unassisted units. In such case, though a breach of contract may have occurred, there would be no monetary damages because plaintiffs would have received the rents to which they are entitled under the contracts. It would be irrelevant that they would have received a higher rent had the rents been calculated using the AAAFs. *See, e.g., Washington Medical Center, Inc. v. United States,* 211 Ct.Cl. 145, 182, 545 F.2d 116, 137 (1976),

*cert. denied,* 434 U.S. 902, 98 S.Ct. 296, 54 L.Ed.2d 188 (1977) ("Even if the council did violate the [D.C. Administrative Procedure] Act ... such violation is no help to these plaintiffs without allegations and proof of their point that such a violation denied them a right to which they were entitled under the law.").

### III.

The procedures HUD employed in determining annual rent adjustments can roughly be divided into three time periods—pre–1981, 1981 through 1984, and post–1984.

Prior to 1981, the comparability limitation in the HAP contracts was largely unenforced and annual adjustments to the contract rents routinely were based on the most recently published AAAFs. However, in 1981, HUD began to use comparability studies when setting the periodic rent adjustments. This effort initially was sporadic. Some HUD field offices used comparability studies to establish rents while others continued to base rents on the applicable AAAFs. Moreover, among those field offices that used comparability studies, the methods employed were inconsistent. Until 1985, there apparently were no guidelines distributed to the HUD field offices concerning procedures for selecting comparable units and determining what constitutes a material difference in rent. Indeed, as of 1985, some HUD field offices had made no attempt to use comparability studies to set rents for Section 8 housing.

Commencing in 1985, the process apparently became at least somewhat more uniform. HUD began to distribute a series of internal memoranda which, *inter alia,* described certain procedures for setting periodic rent increases based on comparability studies. These are the memoranda plaintiffs assert should have been, but were not, promulgated and employed in a manner consistent with the APA and the FOIA.

### IV.

The due process clause of the fifth amendment provides that "[n]o person shall ... be deprived of life, liberty or property without due process of law." Plaintiffs contend that the HAP contracts should be interpreted to include a governmental obligation to comply with due process and that the procedures HUD employed since 1981 in setting periodic rent increases violated plaintiffs' due process rights. However, it is not necessary to address the issue of whether the HAP contracts should be interpreted to include an obligation that the government follow constitutional due process requirements because, in any event, no violation of due process occurred here.

■ To demonstrate a violation of due process, plaintiffs must establish first the existence of a property interest and second that the government deprived plaintiffs of that interest without due process of law. *Noble v. Union River Logging Railroad Co.,* 147 U.S. 165, 176, 13 S.Ct. 271, 274, 37 L.Ed. 123 (1893). Plaintiffs correctly argue that they possess a cognizable property right. The HAP contracts create certain obligations on the part of the government, and rights created by contract can qualify as a property interest protectable by the due process clause. *Lynch v. United States,* 292 U.S. 571, 579, 54 S.Ct. 840, 843, 78 L.Ed. 1434 (1934).[4] Plaintiffs' contention that they were deprived of their property interest in violation of due process has two prongs. Plaintiffs allege first a violation of procedural due process and second, a violation of the equal protection aspects of due process. But neither argument can survive analytic scrutiny.

*Procedural Due Process*

■ "Procedural due process imposes constraints on governmental decisions which deprive individuals of 'liberty' or 'property' interests within the meaning of the Due Process Clause of the Fifth or

---

**4.** As explained above, however, plaintiffs' property interest is not as broad as plaintiffs suggest. Plaintiffs do not have a right to rent adjustments based on the most recently published

AAAFs but rather only a right to receive a rent not materially different than the rent charged for comparable unassisted units.

Fourteenth Amendment." *Mathews v. Eldridge*, 424 U.S. 319, 332, 96 S.Ct. 893, 901, 47 L.Ed.2d 18 (1976). Procedural due process requires "some form of hearing ... before an individual is finally deprived of a property interest." *Id.* at 333, 96 S.Ct. at 902. "The fundamental requirement of due process is the opportunity to be heard 'at a meaningful time and in a meaningful manner.'" *Id.*, quoting *Armstrong v. Manzo*, 380 U.S. 545, 552, 85 S.Ct. 1187, 1191, 14 L.Ed.2d 62 (1965).

■ Herein, plaintiffs had an opportunity to be heard on the issue of the amount of periodic rent adjustments "at a meaningful time and in a meaningful manner." As explained above, the "Overall Limitation" contract provision places the initial responsibility for determining the rents charged for comparable unassisted units with HUD ("as determined by the Government"). However, the HAP contracts establish procedures by which a Section 8 project owner can contest HUD's determination of comparable rents. The contracts contain a disputes procedure by which project owners can secure review within HUD of any factual disputes. Moreover, as defendant acknowledges, a Section 8 project owner ultimately can seek review of HUD's legal and factual determinations involved in setting the periodic adjustments through a breach of contract action in the United States Claims Court.[5]

Plaintiffs are presumably sophisticated real estate owners who voluntarily entered commercial contracts with either the United States government or local public housing agencies. These contracts, along with related statutes and regulations, define the procedures available to plaintiffs to contest the amount of any periodic rent increase. If these procedures were not viewed as adequate to protect plaintiffs' property interest, plaintiffs had the option to exercise their business judgment and refuse to enter these contracts.

■ In any event, the procedures available to plaintiffs satisfy procedural due process. The Supreme Court listed the factors to be considered in assessing a procedural due process claim as follows:

First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.

*Mathews v. Eldridge*, 424 U.S. at 335, 96 S.Ct. at 903.

Applying these factors to the undisputed facts of this case, the private interest affected, as described above, is plaintiffs' right to periodic rent increases that are not materially different from rents charged for comparable unassisted units. The risk of erroneous deprivation of that right is adequately addressed through the existing procedures that permit plaintiffs to secure review of the periodic rent increases within HUD and, if not satisfied, ultimately to bring suit in the United States Claims Court.[6] Indeed, project owners had the

---

5. HAP contracts entered prior to August 1980 provided that disputes concerning questions of fact could be submitted to the Secretary of HUD, whose decision would "be final and conclusive, unless determined by a court of competent jurisdiction to have been fraudulent, or capricious or arbitrary, or so grossly erroneous as necessarily to imply bad faith, or not supported by substantial evidence," except that "nothing herein shall be construed as making final the decision of any administrative official, representative, or board, on a question of law."

The HAP contracts entered after August 1980 provide simply that fact disputes "may be submitted by the Owner to the Secretary of [HUD].

Both parties shall proceed diligently ... pending resolution of the appeal." While there is no specific mention of judicial review, such review clearly would be available. *See, e.g.,* The Wunderlich Act, 41 U.S.C. §§ 321, 322 (1988); n. 14, *infra.*

6. Under procedures in effect at least since 1985, a HUD field office notifies a project owner of its determination as to a periodic rent adjustment, including the manner in which the adjustment was computed and the identity of unassisted projects to which the Section 8 project was compared. Upon request, the project owner may receive a copy of the relevant HUD form, HUD–92273 (Estimates of Market Rents by

opportunity to make their own assessment of rents charged for comparable unassisted units and to present that evidence to HUD and to the courts and seek full retroactive payments. In this setting, additional or substitute safeguards, which would result in additional costs and administrative burdens (the third factor of *Mathews v. Eldridge*), are not required to assure that plaintiffs are heard "at a meaningful time and in a meaningful manner."

Relying on *Historic Green Springs, Inc. v. Bergland,* 497 F.Supp. 839, 856 (E.D.Va. 1980), *vacated as moot* 12 Envtl.L.Rep. (Envtl.L.Inst.) 20100 (E.D.Va.1981), plaintiffs contend that the balancing test of *Mathews v. Eldridge,* 424 U.S. at 335, 96 S.Ct. at 903, should not control here. Plaintiffs argue that where determinations are initially left to the discretion of an agency, such as the comparability determinations here, procedural due process requires that administrators always structure and define their discretionary powers through safeguards, standards, and rules. Plaintiffs fault HUD for failing to adopt agency-wide procedural and substantive standards prior to instituting the comparability studies.

Plaintiffs' reliance on *Green Springs* is misplaced.[7] First, *Green Springs* is readily distinguishable on its facts. For example, *Green Springs* did not involve a con-tract but rather a unilateral government action, *i.e.,* the classification of the plaintiff's land as a historic landmark. Hence, the *Green Springs* plaintiff, unlike the instant plaintiffs, had never agreed to any particular procedure for handling its dispute. Second, and more fundamentally, *Green Springs* is simply incorrect to the extent it suggests that no balancing of factors and interests is required when determining whether the requirements of procedural due process are satisfied in a given case.[8] The Supreme Court explained the rationale for its structured analysis in *Mathews v. Eldridge,* as follows:

> These decisions underscore the truism that " '[d]ue process,' unlike some legal rules, is not a technical conception with a fixed content unrelated to time, place and circumstances." *Cafeteria Workers v. McElroy,* 367 U.S. 886, 895 [81 S.Ct. 1743, 1748, 6 L.Ed.2d 1230] (1961). "[D]ue process is flexible and calls for such procedural protections as the particular situation demands." *Morrissey v. Brewer,* 408 U.S. 471, 481 [92 S.Ct. 2593, 2600, 33 L.Ed.2d 484] (1972). Accordingly, resolution of the issue whether the administrative procedures provided here are constitutionally sufficient requires analysis of the governmental and private interests that are affected.

---

Comparison), which lists characteristics of the comparable projects identified by the HUD appraiser, including location, project type, year built, square foot area, number of rooms, amenities, and services. For each factor, the HUD appraiser may make a plus or minus dollar adjustment to the rents of comparable unassisted projects to reflect differences between particular characteristics of the Section 8 project and comparable unassisted projects.

**7.** The district court generally agreed with plaintiffs' *Green Springs* argument in *Rainier View Assocs. v. United States,* N. C83–997R (W.D.Wash. Jan. 15, 1986)

(order denying defendant's motion for summary judgment and granting summary judgment for plaintiffs). The court found that HUD had violated due process by failing to adopt satisfactory standards and the court declared invalid the comparability studies that had been performed. *Id.* at 14–16. On appeal, the Court of Appeals for the Ninth Circuit agreed that HUD had im-properly calculated the rent adjustments but relied on different grounds than the district court. *Rainier View Assocs. v. United States,* 848 F.2d 988 (9th Cir.1988), *cert. denied,* 490 U.S. 1066, 109 S.Ct. 2065, 104 L.Ed.2d 630 (1989). The Ninth Circuit did not address the due process argument. This court respectfully disagrees with the district court's analysis and conclusions.

**8.** The court in *Green Springs* acknowledged that it was espousing a "fledgeling" principle. But courts subsequently have not adopted this approach and that "fledgeling" principle never matured into an accepted method of constitutional analysis. Plaintiffs' reliance on *Northern California Power Agency v. Morton,* 396 F.Supp. 1187 (D.D.C.1975), *aff'd without opinion, sub nom. Northern California Power Agency v. Kleppe,* 539 F.2d 243 (D.C.Cir.1976), is similarly misplaced. That decision was written one year prior to the Supreme Court's comprehensive discussion of procedural due process in *Mathews v. Eldridge.*

424 U.S. at 334, 96 S.Ct. at 902. The *Green Springs* proposal to eliminate such balancing whenever an exercise of government discretion is involved would run counter to the Supreme Court's teachings and produce an improperly inflexible test for assessing procedural due process.

It certainly is possible that HUD may have made a mistake and that it would have been far more efficient for HUD to develop its comparability standards prior to conducting its first comparability review. On the other hand, it may have been more efficient for HUD to allow the individual field offices to experiment in their comparability procedures as part of an effort to determine the optimal standards. In any event, the issue before the court is not which route hindsight teaches was preferable. The instant issue is simply whether the procedures for addressing potential errors by HUD in conducting comparability studies and determining rent increases were sufficient to satisfy due process. On the undisputed facts of the instant case, HUD's procedures gave plaintiffs a timely and reasonable process for addressing any perceived errors by HUD. No due process violation reasonably can be said to have occurred.[9]

*Equal Protection*

■ Plaintiffs' alternative due process argument was fully developed for the first time at oral argument. Plaintiffs argue, in effect, that by subjecting only a small minority of HAP contractees to comparability studies, HUD violated those contractees' rights under the equal protection aspect of due process. Although the fifth amendment, unlike the fourteenth amendment, does not contain any explicit guarantee of equal protection, in *Bolling v. Sharpe*, 347 U.S. 497, 499–500, 74 S.Ct. 693, 694–95, 98 L.Ed. 884 (1954), the Supreme Court held that the fifth amendment requires the federal government to uphold the same equal protection principles required of the states by the fourteenth amendment. *See also Buckley v. Valeo*, 424 U.S. 1, 93, 96 S.Ct.

612, 670, 46 L.Ed.2d 659 (1976) ("Equal protection analysis in the Fifth Amendment area is the same as that under the Fourteenth Amendment").

Plaintiffs' equal protection argument can be rejected summarily. In *Oyler v. Boles*, 368 U.S. 448, 456, 82 S.Ct. 501, 506, 7 L.Ed.2d 446 (1962), the Supreme Court held that governmental "selectivity" is not itself a violation of the Constitution. The Court explained:

> [T]he conscious exercise of some selectivity in enforcement is not in itself a federal constitutional violation. Even though the statistics in this case might imply a policy of selective enforcement, it was not stated that the selection was deliberately based upon an unjustifiable standard such as race, religion, or other arbitrary classification. Therefore grounds supporting a finding of a denial of equal protection were not alleged.

*Id.* Here, there is no suggestion that the decision to test plaintiffs' rents for comparability was deliberately based upon an unjustifiable standard or arbitrary classification such as race or religion. To the contrary, the allegation is essentially one of selective enforcement, *i.e.*, that plaintiffs were selected for comparability review while other similarly situated project owners were not. Selective enforcement alone does not violate equal protection. *See, e.g., Crass v. Tennessee Valley Authority*, 460 F.Supp. 941, 944–45 (E.D.Tenn.1978), *aff'd without opinion*, 627 F.2d 1089 (6th Cir. 1980) (TVA's demand that only certain surface coal miners fulfill the reclamation provisions of their mining contracts did not violate equal protection unless the selection was based on an arbitrary classification); *Wayte v. United States*, 470 U.S. 598, 105 S.Ct. 1524, 84 L.Ed.2d 547 (1985) (no constitutional violation occurred in selective prosecution of men who failed to register for the draft).

In sum, plaintiffs' allegation that defendant breached the HAP contracts by violat-

---

**9.** Plaintiffs also assert that even if HUD's internal review procedures facially comport with due process, HUD in practice refused to follow these procedures. But a failure to follow the process guaranteed in a contract is properly addressed as a breach of specific contract terms, not as a purported violation of due process.

ing the requirements of due process is without merit. Therefore, defendant's motion for summary judgment on the pertinent due process counts is granted and plaintiffs' motion is denied.

### V.

Next, plaintiffs argue that HUD breached the HAP contracts by failing to comply with APA and FOIA requirements when it determined the "rents charged for ... comparable unassisted units" pursuant to the "Overall Limitation" provision. Plaintiffs' contentions with respect to both the APA and the FOIA focus on a series of internal HUD memoranda drafted commencing in 1985, which instruct HUD employees on how to conduct comparability studies. Plaintiffs contend that the instructions therein amounted to "rules" under the APA and that defendant failed to follow the APA notice and comment procedures prior to adopting these "rules." 5 U.S.C. §§ 551(4), 553(b)(A) (1977). As to the FOIA, plaintiffs similarly contend that HUD was obliged under the FOIA to publish the instructions prior to using them because the instructions involved "substantive rules of general applicability adopted as authorized by law, and statements of general policy or interpretations of general applicability formulated and adopted by the agency." 5 U.S.C. § 552(a)(1)(D) (1977). As described above, a breach of contract is a prerequisite to this court's jurisdiction herein. Therefore, the first issue to address is whether the HAP contracts oblige defendant to comply with the requirements of the APA and the FOIA.

The appropriate place to look to determine whether HUD contractually obliged itself to comply with the APA and the FOIA in the HAP contracts is the contract language. As explained in *Texas v. United States*, 210 Ct.Cl. 522, 531, 537 F.2d 466, 471 (1976), "[i]n suing for a breach of contract plaintiff must rely on the express

terms of the contract and cannot ... import into the agreement terms outside of those expressly contained in the agreement." This standard makes eminent sense.[10] As noted above, the contracts specify HUD's contractual obligations and if plaintiffs had not viewed these as adequate, they should have insisted on additional obligations being included in the contracts or, in the alternative, refused to enter the contracts.

Herein, the HAP contracts are not uniform but each apparently includes either of two pertinent definitions of the scope of the obligations undertaken by HUD. The difference between these two definitions is potentially significant.

### A.

■ The first definition, which apparently was used in HAP contracts entered prior to August 1980, narrowly defines the scope of the agreement so as to include only the specific representations made either in the HAP contracts or in other signed agreements. Paragraph 1.1 of these pre-August 1980 contracts provides, in pertinent part:

> This Contract, including such exhibits, comprises the entire agreement between the parties hereto with respect to the matters contained herein, and neither party is bound by any representations or agreements of any kind except as contained herein or except agreements entered into in writing which are not inconsistent with this Contract.

For these contracts, the requirements of the APA and the FOIA cannot reasonably be said to constitute contractual obligations. The contracts do not contain any mention of the APA, rulemaking, or the FOIA. There is no provision therein that can be interpreted as committing HUD to follow APA notice and comment procedures or FOIA publication procedures when making comparability determinations

---

**10.** Plaintiffs rely on *Rudder v. United States,* 226 F.2d 51 (D.C.Cir.1955), *Hickman v. Pierce,* No. 82–C–7736 (N.D.Ill. Nov. 20, 1984), and *Alaniz v. OPM,* 728 F.2d 1460 (Fed.Cir.1984), for the proposition that contract damages are available for constitutional or APA violations even if no ex-

plicit mention of the Constitution or the APA is made in the contracts. But in none of these cases did the court conclude that a violation of the APA constituted a breach of any contract so as to warrant the award of breach damages.

under the "Overall Limitation" provision of the contracts.

In contending to the contrary, plaintiffs point to HUD's own regulations. Plaintiffs contend that 24 C.F.R. § 10.1 (1987) (Section 10.1)[11] should be interpreted as a representation that HUD will comply with the APA and 24 C.F.R. § 15.11 (1987) (Section 15.11)[12] as a representation that HUD will comply with the FOIA. But regardless of what these regulations provide, they simply were never incorporated into the pre-August 1980 HAP contracts. Given the unequivocal contract language excluding noncontractual "representations ... of any kind," any failure to comply with the representations in these regulations cannot reasonably be a basis for a breach of contract claim. Therefore, to the extent that any of plaintiffs' claims rest exclusively on such a pre-August 1980 contract, no breach of contract claim based on a violation of the APA or the FOIA or related regulations can be shown. Defendant's motion for summary judgment as it relates to such claims therefore must be granted and plaintiffs' corresponding motion must be denied.

**B.**

A different definition was apparently used in the HAP contracts entered after August 1980. Rather than excluding all representations not included in written contracts, the "Scope of Contract" clause in these contracts specifically includes "applicable regulations." Paragraph 1.1(g) of these contracts provides:

*Scope of Contract.* This Contract, including the exhibits, whether attached or incorporated by reference, comprises the entire agreement between the Owner and HUD with respect to the matters contained in it. Neither party is bound by any representations or agreements of any kind except as contained in this Contract, *any applicable regulations,* and agreements entered into in writing by the parties which are not inconsistent with this Contract.

(Emphasis added.) Thus, assuming, as plaintiffs allege, that APA and FOIA requirements are embodied respectively in Sections 10.1 and 15.11,[13] the requirements

**11.** Section 10.1 states, in pertinent part:

It is the policy of [HUD] to provide for public participation in rulemaking with respect to all HUD programs and functions including matters that relate to public ... contracts even though such matters would not otherwise be subject to rulemaking by law or Executive policy. The Department therefore publishes notices of proposed rulemaking in the FEDERAL REGISTER and gives interested persons an opportunity to participate in the rulemaking through submission of written data, views, and arguments with or without opportunity for oral presentation. It is the policy of the Department that its notices of proposed rulemaking are to afford the public not less than sixty days for submission of comments.... Unless required by statute, notice and public procedure will be omitted if the Department determines in a particular case or class of cases that notice and public procedure are impracticable, unnecessary or contrary to the public interest. In a particular case, the reasons for the determination shall be stated in the rulemaking document. Notice and public procedure may also be omitted with respect to statements of policy, interpretative rules, rules governing the Department's organization or its own internal practices or procedures, or if a statute expressly so authorizes. A final substantive rule will be published not less than 30 days before

its effective date, unless it grants or recognizes an exemption or relieves a restriction or unless the rule itself states good cause for taking effect upon publication or less than 30 days thereafter. Statements of policy and interpretative rules will usually be made effective on the date of publication.

**12.** Section 15.11 states, in pertinent part:

Subject to the exemptions in § 15.21, the Department shall separately state and currently publish in the FEDERAL REGISTER for the guidance of the public:

\*　\*　\*　\*　\*　\*

(d) Substantive rules of general applicability adopted as authorized by law, and statements of general policy or interpretations of general applicability formulated and adopted by the Department.

\*　\*　\*　\*　\*　\*

Except to the extent that a person has actual and timely notice of the terms thereof, no person shall in any manner be required to resort to or be adversely affected by any matter required to be published in the FEDERAL REGISTER and not so published.

**13.** Defendant disputes this assumption. The court will hear further argument on the parties' respective contentions as to the proper interpretation of these sections when it hears argument

658

of the APA and the FOIA would apply to the post-August 1980 HAP contracts if the court were to conclude that Sections 10.1 and 15.11 constitute "applicable regulations." But the parties' respective briefs do not focus on the "scope of contract" clause in these contracts and do not discuss the issue of which regulations come within the scope of the term "applicable regulations." The court is hesitant to resolve this issue without providing the parties an opportunity to review all provisions in the post-August 1980 HAP contracts and present their respective arguments to the court as to whether the two HUD regulations would constitute "applicable regulations." [14]

Additional briefing on another issue may also be warranted. If the court concludes that Sections 10.1 and 15.11 are "applicable regulations" and incorporate the requirements of the APA and the FOIA, the court would then have to determine whether HUD breached the contract by violating these regulations. As generally described above, plaintiffs' contention that a violation occurred focuses on HUD's determining rents charged for comparable units based on instructions contained in a series of internal HUD memoranda. But the precise instructions in issue have not been adequately defined. In the course of briefing and oral argument, plaintiffs continued to supplement the list of memoranda involved but never specified which instructions in which memoranda they dispute. Indeed, plaintiffs specified only a few examples of allegedly improper instructions.

There is not always an easy-to-apply "bright line" between rules or statements of policy that are subject to the require-

ments of the APA and/or the FOIA and those that are not. For example, the APA excludes rules that otherwise fit the statutory definition of "rule" but can be characterized as "interpretive rules, general statements of policy, or rules of agency organization, procedure, or practice." 5 U.S.C. § 553(b)(A). Herein, apparently not all instructions were used for each comparability determination and, in addition, it is at least possible that some instructions may fall on one side of the line while others fall on the other side. In this context, it seems appropriate for the court to consider all of the suspect instructions at one time and hear argument on where the line generally should be drawn for applying the requirements of the APA and the FOIA and also on which side of the line each suspect instruction lies. A prerequisite to any such argument would be a more detailed explanation by plaintiffs of the suspect instructions and the specific instructions in dispute.

## CONCLUSION

In summary, the court concludes as follows.

1. Defendant's motion for summary judgment as it relates to plaintiffs' due process claims is granted and plaintiffs' corresponding motion is denied.

2. As to plaintiffs' claims involving an alleged violation of the APA or the FOIA, this court lacks jurisdiction over such claims except to the extent that the alleged violation involves a breach of contract. With respect to the first class of contracts described in Section V above, which do not

as to whether Sections 10.1 and 15.11 are "applicable regulations."

**14.** Plaintiffs' allegations of breach of contract apparently do not rest exclusively on the incorporation of due process, the APA, and the FOIA into the contracts. Plaintiffs apparently allege that even if these provisions do not apply, HUD nevertheless breached the HAP contracts by incorrectly determining the rents charged for comparable unassisted units. Pursuant to the HAP contracts, comparability was to be determined by HUD ("adjustments ... shall not result in material differences between the rents charged for assisted and comparable unassisted

units, *as determined by the Government*" (emphasis added)). However, even in the absence of a contractual restriction on HUD in making this determination, HUD would be limited by its contractual obligation to act reasonably. *Pacific Far East Line, Inc. v. United States,* 184 Ct.Cl. 169, 184, 394 F.2d 990, 998 (1968). Hence, it would constitute a breach of contract if HUD's determination of comparability was unreasonable (*e.g.,* if it was arbitrary or capricious, *id.*) notwithstanding that it did not violate a specific obligation contained in a statute or applicable regulation.

incorporate "applicable regulations," the court concludes that a violation of the APA or the FOIA would not constitute a breach of contract. Hence, defendant's motion for summary judgment on the APA and FOIA claims for those contracts is granted and plaintiffs' corresponding motion is denied.

With respect to the second class of contracts, which do incorporate "applicable regulations," the court concludes that additional briefing is necessary to determine whether a breach of contract based on a failure to comply with Sections 10.1 and 15.11 occurred.

3. Assuming plaintiffs can prove such a breach of contract, the proper measure of damages would not be the difference between the rents actually received and the rents that would have been received had the adjustments been based on the AAAFs. Rather, pursuant to the "Overall Limitation" provision, the rent adjustments may not result in material differences from the rents charged for comparable unassisted units. Hence, assuming plaintiffs can establish a breach of contract, an assessment of damages could necessitate a factual inquiry, on a project-by-project basis, of rents charged for comparable unassisted units.

IT IS SO ORDERED.