**NATIONAL LEASED HOUSING ASSOCIATION, et al., Plaintiffs,**

v.

**The UNITED STATES, Defendant.**

**Nos. 6–87C, 324–87C, 204–88C and 6–90C.**

United States Court of Federal Claims.

Dec. 21, 1994.

Charles L. Edson, Washington, DC, for plaintiffs; Harry J. Kelly and Richard M. Price, of counsel.

John E. Kosloske, with whom were Asst. Atty. Gen., Frank W. Hunger and David M. Cohen, Director, Washington, DC, for defendant.

## OPINION

ANDEWELT, Judge.

### I.

In these consolidated actions, plaintiffs, National Leased Housing Association and

230 present or former owners of rental housing projects seek back-rent payments from the United States for housing units plaintiffs rented to low-income families pursuant to Section 8 of the United States Housing Act of 1937, as amended, 42 U.S.C. § 1437f (the Housing Act). Each plaintiff entered a Housing Assistance Payments (HAP) contract which, in effect, guaranteed to the project owner an initial specified contract rent for each housing unit rented to a low-income family and provided for periodic adjustments to that rent. Certain plaintiffs entered HAP contracts directly with the Department of Housing and Urban Development (HUD) while other plaintiffs entered HAP contracts with public housing agencies (PHAs), which previously had entered contracts with HUD. Plaintiffs contend that the periodic adjustments to the contract rents resulted in rents lower than those to which plaintiffs were entitled and plaintiffs seek related damages herein.

These actions are presently before the court for resolution of a series of issues raised in the parties' cross-motions for summary judgment. The court will address each issue in turn below. The court summarized the relevant background facts in two prior decisions and will not repeat those facts herein. *National Leased Housing Ass'n v. United States*, 22 Cl.Ct. 649 (1991) *(NLHA I); National Leased Housing Ass'n v. United States*, 24 Cl.Ct. 647 (1991) *(NLHA II )*.

## II.

The first issue the court will address is defendant's contention that this court lacks jurisdiction over the claims presented by those plaintiffs that entered HAP contracts with the PHAs and not directly with HUD. Under the Tucker Act, 28 U.S.C. § 1491(a)(1), the Court of Federal Claims has jurisdiction "to render judgment upon any claim against the United States founded ... upon ... any express or implied contract with the United States." Defendant contends that for a claim to be "founded ... upon ... any express or implied contract with the United States" privity of contract must exist between a plaintiff and the United States, and that privity is lacking here for those plaintiffs that entered HAP contracts with the PHAs. Plaintiffs respond with two alternative arguments. First, plaintiffs allege that privity does exist here because the PHAs were acting as HUD's agents when the PHAs entered the HAP contracts with plaintiffs. Second, in the alternative, plaintiffs contend that privity of contract is not required because plaintiffs may bring suit as third-party beneficiaries of the contracts between HUD and the PHAs which authorized the PHAs to enter the HAP contracts with plaintiffs.

## III.

### A.

■ Turning first to the agency issue, the statutory authority for HUD's use of a two-tier contracting scheme whereby HUD contracted with the PHAs and the PHAs subsequently contracted with the project owners is contained in Section 8(b)(2) of the Housing Act, as originally enacted in 1974, which provides:

> [T]he Secretary [of HUD] is authorized to make assistance payments pursuant to contracts with owners or prospective owners who agree to construct or substantially rehabilitate housing in which some or all of the units shall be available for occupancy by lower-income families in accordance with the provisions of this section.... The Secretary may also enter into annual contributions contracts with public housing agencies pursuant to which such agencies may enter into contracts to make assistance payments to such owners or prospective owners.

42 U.S.C. § 1437f(b)(2) (1982).[1]

Neither the first-tier contracts between HUD and the PHAs nor the second-tier con-

---

1. Although Congress repealed Section 8(b)(2) of the Housing Act in 1983, that repeal did not affect HUD's commitments for payment of rent subsidies contained in then-existing HAP contracts pursuant to Section 8(b)(2). *See* Housing and Urban–Rural Recovery Act of 1983, Pub.L. No. 98–181, §§ 209(a)(2) and 209(b)(1), 97 Stat. 1153, 1155, 1183 (1983) (Section 8(b)(2) would "remain in effect ... with respect to any funds obligated for a viable project under [the Housing

tracts between the PHAs and the project owners contain any specific statement to indicate that in entering the HAP contracts with the project owners the PHAs were acting as HUD's legal agents. Hence, plaintiffs, in effect, ask this court to imply an agency relationship from the provisions of the first- and second-tier contracts and the related facts.

### B.

The first-tier contracts between HUD and the PHAs are referred to as Annual Contributions Contracts (ACCs).[2] In Sections 1.2 and 1.4 of the ACCs, respectively, HUD authorizes the PHAs to enter HAP contracts with project owners on behalf of low-income families and agrees to make annual contributions to cover the PHAs' housing assistance payments plus an allowance for administration costs. In Section 1.8, HUD designates the PHAs as "Contract Administrators" responsible for administering, in accordance with HUD regulations and subject to review by HUD, the HAP contracts the PHAs enter with the project owners. Section 2.3 of the ACCs describes family eligibility requirements to be enforced by the PHAs through the project owners; Sections 2.4 to 2.15 outline certain inspection, nondiscrimination, equal employment, and financial requirements; and Section 2.16 defines events constituting default by the PHAs and allows HUD to assume the rights and obligations of the PHAs in order to meet the terms of the HAP contracts. The ACCs do not anywhere describe the calculation of annual adjustments to contract rents.

The second-tier contracts between the PHAs and the project owners, the HAP contracts, contain not only the signatures of the PHAs and the project owners, but also, under the heading "APPROVED," the signature of an officer of HUD.[3] Section 1.5(c) of the HAP contracts provides that HUD's approval of an HAP contract signifies that HUD has properly executed an ACC with a PHA and has set aside funds for annual contributions to that PHA. With respect to HAP contract rents, Section 1.9(b)(1) of the HAP contracts requires the PHAs to adjust the contract rents on an annual basis upon the request of the project owners. Pursuant to Section 1.9(b)(2), the PHAs can adjust the contract rents upward or downward "as may be appropriate," but the rent may not fall below the initial guaranteed contract rent. Section 1.9(c) provides that the PHAs, with the approval of HUD, can grant "special additional adjustments" to the contract rents to reflect increased operating costs not covered by the annual adjustments. Section 1.9(d), entitled "Overall Limitation," provides that rent adjustments may not result in material differences between rents charged for assisted and comparable unassisted units as determined by the PHAs. In providing for adjustments to the contract rents, the HAP contracts refer to Automatic Annual Adjustment Factors (AAAFs) which are described in 24 C.F.R. pt. 888. These regulations require, *inter alia*, that the government calculate on an annual basis AAAFs which, subject to the overall limitation, may be used in determining HAP contract rent adjustments.

### C.

Plaintiffs contend that given the nature of the relationships created in HUD's two-tier contracting scheme, the PHAs were acting as HUD's agents when they entered the second-tier HAP contracts with plaintiffs. Because plaintiffs entered contracts with HUD's agents, plaintiffs argue, they should be deemed to be in privity of contract with HUD. But courts have analyzed analogous two-tier contracting arrangements wherein HUD contracted with a local housing authori-

---

Act] prior to January 1, 1984."). As plaintiffs acknowledge, the present version of Section 8(b)(2), enacted in 1990 as part of the Cranston–Gonzalez National Affordable Housing Act, Pub.L. No. 101–625, § 413(b)(1), 104 Stat. 4079, 4160 (1990), is not relevant to this litigation.

**2.** All citations to the ACCs in this decision refer to a sample contract included in Exhibit A of the appendix to defendant's March 10, 1994, filing.

Because Part III of that sample contract is most commonly included as Part II of an actual ACC, the court has converted all references to Part III to Part II. For example, the court refers to Section 3.16 of the sample ACC as Section 2.16.

**3.** All citations to the HAP contracts in this decision refer to the Blackduck Apartments sample contract included in Exhibit G of the appendix to plaintiffs' February 1, 1994, filing.

ty and the housing authority in turn contracted with a project developer, and the courts uniformly have rejected the argument that the housing authority acted as HUD's agent. *See New Era Constr. v. United States,* 890 F.2d 1152 (Fed.Cir.1989); *Marshall N. Dana Constr., Inc. v. United States,* 229 Ct.Cl. 862 1982 WL 26554 (1982); *G–Lam Corp. v. United States,* 227 Ct. Cl. 764, 1981 WL 21446 (1981); *Correlated Development Corp. v. United States,* 214 Ct.Cl. 106, 556 F.2d 515 (1977); *Housing Corp. of America v. United States,* 199 Ct.Cl. 705, 468 F.2d 922 (1972); *D.R. Smalley & Sons, Inc. v. United States,* 178 Ct.Cl. 593, 372 F.2d 505, *cert. denied,* 389 U.S. 835, 88 S.Ct. 45, 19 L.Ed.2d 97 (1967).

*Housing Corp.* involved HUD's use of a two-tier contracting arrangement to secure construction of low-income housing projects. Therein, HUD entered a contract with a local housing commission which in turn entered a contract with a project developer for the development, construction, and sale of a low-income housing project. In the first-tier contract between HUD and the housing commission, HUD agreed to fund up to 90 percent of the project costs. The second-tier contract between the housing commission and the project developer required HUD's approval, and HUD apparently had the authority to approve drawings, plans, and specifications and all changes in the contract price in excess of $4,000. *Housing Corp.,* 199 Ct. Cl. at 708, 468 F.2d at 923–24. Article IX of the second-tier contract described the requirement for HUD's approval as follows:

> ARTICLE IX. *Approval by Government.* The approval of this Agreement by the Government signifies that the undertaking by the Purchaser of the acquisition of the property constitutes a "project" eligible for financial assistance under the Annual Contributions Contract identified in Exhibit "C;" that said Annual Contributions Contract has been properly authorized; that funds have been reserved by the Government and will be available to effect payment and performance by the Purchaser hereunder; and the Government approval of the terms and conditions hereof.

*Id.* at 708, 468 F.2d at 923.

Despite HUD's intimate involvement in and control over the terms of the second-tier contract, the *Housing Corp.* court rejected the project developer's contention that it could sue HUD directly to recover construction costs because the local housing commission had acted as HUD's agent. Pointing to the opening paragraph of the second-tier contract, which identified the parties to the contract as the local housing commission and the project developer, the court stated: "This [paragraph] makes it rather clear who the parties are and [HUD] is not one of them." *Id.* at 709, 468 F.2d at 924. The court noted that the level of government involvement in the second-tier contract between the public housing commission and the project developer, including the requirement that HUD sign and approve the contract, did not mean that the project owner could sue the government directly. The court explained:

> The contract here in issue is one of many pursuant to which the Federal Government subsidizes projects of state and local authorities for the public betterment. The United States, however, does not make itself a party to the contracts relating to said projects but obligates itself by separate agreements, as here, to local authorities for the funding of those projects it approves. The significance of that approval is spelled out here in Article IX. This does not create an express or implied contract between plaintiff and defendant nor does it make the Commission defendant's agent through HUD.

*Id.* at 710, 468 F.2d at 924.

*Dana Constr.,* 229 Ct.Cl. at 862, involved the same type of contracting scheme and therein, the Court of Claims restated essentially the same point, as follows:

> [I]t is settled that there is no privity of contract between the U.S. and a public housing contractor based on the U.S. Housing Act. That the Federal Government has intimate control over a project, including prior approval of plans and costs, does not establish liability here for claims by a contractor. Nor does this degree of involvement indicate an implied-in-fact contract enforceable against the United States. This is true even if the local agen-

cy is acting merely as a conduit for the federal funds. By funding and regulating programs designed for the public good the U.S. is acting in its role as a sovereign and the moneys promised are gifts or gratuities which do not establish any contractual obligation, express or implied, on the part of the United States.

*Id.* at 863–64 (citations omitted).

The instant contracts between HUD and the PHAs and between the PHAs and plaintiffs are structured in a way similar to that of the two-tier contracts involved in *Housing Corp.* and *Dana Constr.* In the instant case, as in *Housing Corp.* and *Dana Constr.*, HUD is not listed as a party to the second-tier contracts but rather only as an entity whose approval is required. The approval provision in Section 1.5 of the instant second-tier contracts is analogous to Article IX of the second-tier contract in *Housing Corp.*, and provides:

a. *Identification of [the ACC].* The [PHA] has entered into an [ACC] with the Government ... under which the Government will provide financial assistance to the [PHA] pursuant to section 8 of the [Housing] Act for the purpose of making housing assistance payments....

    \*    \*    \*    \*    \*    \*

c. *Government Approval of [the HAP] Contract.* The approval of this [HAP] Contract by the Government signifies that the Government has executed the ACC and that the ACC has been properly authorized; that the faith of the United States is solemnly pledged to the payment of annual contributions pursuant to said ACC; and that funds have been obligated by the Government for such payments to assist the [PHA] in the performance of its obligations under the [HAP] Contract.

Hence, HUD's payments are not directed at paying HUD's own obligations to the local project owners, but rather at "assist[ing] the [PHA] in the performance of [the PHA's] obligations."

### D.

Plaintiffs argue that *Housing Corp.* and *Dana Constr.* are distinguishable from the instant case because those cases involved pre-Section 8 housing legislation where HUD acted in a sovereign capacity when it funded the projects. Under Section 8, plaintiffs argue, HUD acted in a proprietary capacity in that HUD, like any other business enterprise, exploited the benefits of the private housing market to purchase housing services from the entities that owned the resources. But this distinction does not serve to distinguish Section 8 cases from the pre-Section 8 situation. In the two-tier contracting arrangement in *Housing Corp.*, HUD exploited the private market in much the same way as in the two-tier arrangement here. In *Housing Corp.*, HUD exploited the private market for the development of a real estate housing project when it sought to encourage production of low-income housing by the private sector by agreeing to fund up to 90 percent of the project costs. Moreover, not only are the means HUD used in the pre-Section 8 cases analogous to those used here, but also HUD's ultimate aim in the two-tier contracting arrangements under both legislative schemes is precisely the same—to secure housing in certain localities for low-income families.

### E.

Next, plaintiffs argue that *Housing Corp.* and *Dana Constr.* are distinguishable from the instant case because under the statutory schemes involved in those cases, HUD used the two-tier contracting scheme for all low-income housing contracts, but under Section 8 HUD frequently contracted directly with the project owners. Because HUD accomplished the same objectives through the PHAs as it achieved through direct contracts with the project owners, and because the same rules, including HUD regulations, generally applied to both contracts, plaintiffs argue that when HUD chose to employ PHAs instead of direct contracts with the project owners, HUD necessarily used the PHAs as its agents. But the legislative history of Section 8 supports the conclusion that Congress intended the PHAs not to act as HUD's agents, but rather as the entities

primarily responsible for carrying out Section 8 objectives. *See* S.Rep. No. 93–693, 93rd Cong., 2d Sess. (1974), *reprinted in* 1974 U.S.C.C.A.N. 4273, 4314 ("The Committee is firmly convinced that primary responsibility for carrying out the leasing program should be vested in public housing agencies.").

▮ A second and more fundamental problem with plaintiffs' argument is that to say that HUD had two choices available to accomplish the same goal is not to say that the two choices have the same legal effect. The requirement for privity of contract has an important legal basis which plaintiffs do not seem fully to appreciate. It is a fundamental legal tenant that the United States as sovereign is immune from suit except where it consents to be sued and that any such waiver of sovereign immunity must be narrowly construed. *United States v. Mitchell*, 445 U.S. 535, 538, 100 S.Ct. 1349, 1351, 63 L.Ed.2d 607 (1980); *United States v. Testan*, 424 U.S. 392, 399, 96 S.Ct. 948, 953, 47 L.Ed.2d 114 (1976). Where the government enters a contract directly with a party, it expresses its intent to open itself to a suit by that party in this court under the Tucker Act because such suit would unquestionably be "upon [an] express contract with the United States." 28 U.S.C. § 1491(a)(1). When the government chooses instead to employ a two-tier contracting scheme whereby it has no direct contractual relationship with an entity, the intent to permit that entity to sue the United States is not similarly apparent from the wording of the Tucker Act.

Based apparently in part upon this concern, courts have not been willing to allow suits against the government based on an agency theory unless the contract contains a reasonably clear indication that the government intended to create an agency relationship and to permit such a suit. *United States v. Johnson Controls, Inc.*, 713 F.2d 1541 (Fed.Cir.1983). In *Johnson Controls*, the court reviewed the precedent relating to the ability of a subcontractor to bring a suit on a government contract directly against the United States. The court concluded that the precedent established three prerequisites for such a suit. "[In that precedent,] the prime contractor was (1) acting as a *purchasing* agent for the government, (2) the agency relationship between the government and the prime contractor was established by clear contractual consent, and (3) the contract stated that the government would be directly liable to the vendors for the purchase price." *Id.* at 1551.

Herein, even assuming the PHAs could be said, in effect, to have been acting as purchasing agents for HUD, the second and third prerequisites of *Johnson Controls* are not satisfied. As to the second requirement, there is no "clear contractual consent" establishing an agency relationship. Unlike the two cases cited in *Johnson Controls* as the basis for this prerequisite,[4] neither the contracts between HUD and the PHAs nor the contracts between the PHAs and plaintiffs contain a specific statement that the PHAs were acting as HUD's agents.

Plaintiffs rely primarily upon Sections 1.2 and 1.8 of the ACCs, which provide:

1.2 *AUTHORIZATION OF ACTIONS BY PHA.* The PHA is authorized to (a) enter into an Agreement, (b) enter into a Contract, (c) make housing assistance payments on behalf of Families, and (d) take other necessary actions, all in accordance with the forms, conditions, regulations, and requirements prescribed or approved by HUD. However, neither the PHA nor HUD shall assume any obligation beyond that provided in the HUD-approved Agreement and Contract.

\* \* \* \* \* \*

1.8 *RESPONSIBILITY FOR ADMINISTRATION OF [THE HAP] CONTRACT.* The PHA as Contract Administrator (CA) is primarily respon-

---

4. In *Kern–Limerick, Inc. v. Scurlock*, 347 U.S. 110, 112 n. 2, 74 S.Ct. 403, 405 n. 2, 98 L.Ed. 546 (1954), the construction contract provided that " '[t]he Contractor shall act as the purchasing agent of the Government in effecting such procurement.' " In *Western Union Tel. Co. v.* *United States*, 66 Ct.Cl. 38, 1928 WL 3062 (1928), the construction contract named the prime contractor as the "construction manager" and provided that the construction manager was " 'empowered and authorized to make, as agent for the United States of America, all contracts.' "

sible for administration of the [HAP] Contract in accordance with this ACC and HUD regulations and requirements, subject to review and audit by HUD.

But, in effect, what HUD accomplishes in these provisions is to require the PHAs to perform certain specified actions in a manner prescribed by HUD. Government agencies make analogous demands in every government contract. Under *Johnson Controls,* such limitations in a contract are not sufficient; there must be a "clear contractual consent" for an agency relationship to arise. Rather than expressing a clear contractual consent that the PHAs will operate as HUD's agents when carrying out the terms of the HAP contracts, Sections 1.2 and 1.8 of the ACCs seem to point in the opposite direction. Section 1.2 stresses that HUD will not assume any obligation not provided for in the ACCs and the HAP contracts. Section 1.8, rather than demonstrating an intent to interact directly with the project owners, indicates that HUD removed itself from direct interaction with the project owners and left administration of the HAP contracts primarily up to the PHAs.

Turning to the third prerequisite of *Johnson Controls,* neither the ACCs nor the HAP contracts contain a statement that HUD would be directly liable to the project owners if, as alleged here, the PHAs improperly calculated periodic rent adjustments. To the contrary, as noted above, Section 1.5(c) of HAP contracts anticipates that HUD's payments would be directed at assisting the PHAs in performing the PHAs' obligations to the project owners rather than at paying HUD's obligations to the project owners.

Plaintiffs rely on Section 2.16(a) of the ACCs as evidence of HUD's direct liability to the project owners, but that section does not purport to create direct liability on the instant facts.[5] Section 2.16(a) authorizes HUD, in the event of default by the PHAs, to assume the rights and obligations of the PHAs under the HAP contracts. Section 2.16(a) further provides that its provisions shall be enforceable by a project owner "against HUD by suit at law or in equity," but only after the occurrence of the following events: (1) the project owner requests HUD to determine whether a default has occurred; (2) HUD, after affording the PHA an opportunity to "take corrective action," determines that the PHA is in default; and (3) HUD assumes the PHA's rights and obligations under the HAP contract. At most, there-

---

5. Section 2.16(a) provides:

(1) *Events of Default.* The occurrence of any of the following events, if the Owner is not in default, shall constitute a default under this ACC:

    (i) If the PHA fails to perform or observe any term or condition of the Agreement or Contract with the Owner;

    (ii) If the Agreement or Contract is held to be void, voidable, or ultra vires;

    (iii) If the power or right of the PHA to enter into the Agreement or Contract is drawn into question in any legal proceeding; or

    (iv) If the PHA asserts or claims that the Agreement or Contract is not binding upon the PHA for any such reason.

(2) *Owner Request for HUD Determination of Default.*

If the Owner believes that an event as specified in paragraph (a)(1) has occurred, and the Owner is not in default, the Owner may, within 30 days of the initial occurrence of the event;

    (i) Notify HUD of the occurrence of the event;

    (ii) Provide supporting evidence of the default and of the fact that the Owner is not in default; and

    (iii) Request HUD to determine whether there has been a default.

(3) *HUD Determination of Default and Curing of Default.*

    HUD, after notice to the PHA giving it a reasonable opportunity to take corrective action, or to demonstrate that it is not in default, shall make a determination whether the PHA is in default and whether the Owner is not in default. If HUD determines that the PHA is in default and that the Owner is not, HUD shall take appropriate action to require the PHA to cure the default. If necessary for the prompt continuation of the project, HUD shall assume the PHA's rights and obligations under the Agreement and/or Contract in accordance with paragraph (b)(3).

(4) *Enforcement by Owner.* The provisions of this paragraph (a) are made for the benefit of the Owner, the lender, the PHA where it is the lender and then only in its capacity as lender, and the Owner's other assignees, if any, who have been specifically approved by HUD prior to the assignment. These provisions shall be enforceable by these parties against HUD by suit at law or in equity.

fore, HUD has undertaken a secondary, contingent liability to the project owners which is dependent upon HUD's determining that the PHAs are in default and HUD's assuming the rights and obligations of the PHAs under the HAP contracts. Plaintiffs have not alleged that either of these two conditions exists with respect to any of those plaintiffs that entered the HAP contracts with the PHAs. Because Section 2.16 establishes prerequisites for HUD's liability and because those requirements were not satisfied here, HUD is not directly liable to those plaintiffs. In *Correlated Development,* 214 Ct.Cl. at 115, 556 F.2d at 521, the Court of Claims interpreted a contract provision analogous to Section 2.16 in this same way, as follows:

> We do not agree that Section 13 gives the plaintiff the right to maintain this suit against the government. The simple answer to plaintiff's argument in this regard is the fact that none of the contingencies mentioned in Section 13 ever occurred. There was never a substantial default by [the PHA]; the government never took over nor completed the projects nor was ever requested to do so by the [PHA] or the plaintiff; nor was the right, title, or interest of [the PHA] in the projects ever delivered or transferred to the government.

### IV.

■ Next, plaintiffs argue that even if their agency theory fails, they can bring the instant suit directly against HUD on the alternate theory that they are third-party beneficiaries of the contracts between HUD and the PHAs. Under the doctrine of third-party beneficiaries, an entity that is not a party to a contract nevertheless can bring a suit on that contract when the contract is intended for that entity's direct benefit. *German Alliance Ins. Co. v. Home Water Supply Co.,* 226 U.S. 220, 230, 33 S.Ct. 32, 35, 57 L.Ed. 195 (1912) ("Before a stranger can avail himself of the exceptional privilege of suing for a breach of an agreement, to which he is not a party, he must, at least show that it was intended for his direct benefit."). *See also Robo Wash, Inc. v. United States,* 223 Ct.Cl. 693, 1980 WL 13154 (1980) (applying the third-party beneficiary theory to government contracts).

The *Restatement (Second) of Contracts* § 302 (1979) proposes the following standard for determining whether a third party is an intended beneficiary of a contract: "Unless otherwise agreed between promisor and promisee, a beneficiary of a promise is an intended beneficiary if recognition of a right to performance in the beneficiary is appropriate to effectuate the intention of the parties." This standard is especially appropriate with respect to suits brought against the United States because if the United States did not intend to allow a contract action against it by an entity that is not a party to the contract, then it can be argued that the United States never waived sovereign immunity so as to authorize such a suit.

■ Allowing plaintiffs to bring the instant suit directly against the United States would not effectuate HUD's intent when HUD entered the ACCs with the PHAs. HUD's intent, as exhibited in the provisions of the ACCs, was to create a two-tier contracting arrangement in which, unless an exception such as Section 2.16 applied, the project owners would interact directly with the PHAs, not HUD, in the administration of the HAP contracts. In this regard, the instant case is not a typical third-party beneficiary case where a third party would not have any legal means to secure a contractual benefit unless the court recognized that party's right to bring a cause of action as a third-party beneficiary. The ACCs anticipate that the PHAs would in turn enter HAP contracts directly with the project owners and that these second-tier contracts would provide the project owners with contractual rights enforceable against the PHAs. The HAP contracts oblige the PHAs to grant periodic rent adjustments and provide that such adjustments may not result in material differences between rents charged for assisted and comparable unassisted units "as determined by the [PHAs]." Hence, in the event the PHAs did not live up to their obligations with respect to periodic rent adjustments, the project owners could bring suit directly against the PHAs.

To support their argument that they are proper third-party beneficiaries, plaintiffs cite several district court decisions in which the courts allowed tenants to bring suits against HUD as third-party beneficiaries of ACCs. *See e.g., Henry Horner Mothers Guild v. Chicago Housing Authority,* 824 F.Supp. 808, 820 (N.D.Ill.1993); *Gomez v. Housing Authority,* 805 F.Supp. 1363, 1368 (W.D.Tex.1992); *Hurt v. Philadelphia Housing Authority,* 806 F.Supp. 515, 527 (E.D.Pa. 1992); *Henry Horner Mothers Guild v. Chicago Housing Authority,* 780 F.Supp. 511, 515 (N.D.Ill.1991); *Tinsley v. Kemp,* 750 F.Supp. 1001, 1012 (W.D.Mo.1990); *Concerned Tenants of Father Panik Village v. Pierce,* 685 F.Supp. 316, 323 (D.Conn.1988). The Section 8 program, however, is directed at securing quality housing for low-income families. In that sense, the tenants of the low-income housing are more appropriately characterized as the "intended beneficiaries" of the ACCs than are the project owners. In any event, a determination as to whether a particular individual or class of individuals is a third-party beneficiary of a contract must be made on an individual-by-individual or class-by-class basis. Before declaring that any individual or class of individuals is a third-party beneficiary, a court would have to determine whether allowing such a third-party beneficiary suit would effectuate the intent of the parties to the contract. Herein, assuming the district court decisions are correct, a determination that allowing tenants to bring a certain type of suit against HUD would effectuate the intent of the parties to the ACCs does not mean that allowing a different class of individuals, *i.e.,* the project owners, to bring a different type of suit against HUD, *i.e.,* a suit for increased periodic rent adjustments, would also effectuate the parties' intent. To the contrary, as explained above, the parties' intent as exhibited in the provisions of the ACCs points against allowing direct suits against HUD by the project owners where the prerequisites of Section 2.16 do not apply.

Thus, for the reasons set forth above, those plaintiffs that entered HAP contracts with the PHAs rather than directly with HUD may not bring a breach of contract suit against defendant because those plaintiffs lack privity of contract with HUD and are not third-party beneficiaries of the ACCs.

### V.

#### A.

Pursuant to Sections II through IV, *supra,* the plaintiffs remaining in this action are those plaintiffs that entered HAP contracts directly with HUD. The parties' cross-motions for summary judgment raise a series of issues with respect to these plaintiffs. The first issue the court will address involves HUD's use of comparability studies when calculating the periodic adjustments to the HAP contract rents. Plaintiffs contend that the HAP contracts do not permit HUD to rely upon such studies to decrease the contract rents below the amount HUD guaranteed for the prior year. Defendant disagrees. Resolution of this issue requires interpreting the rent adjustment provision contained in Section 1.9 of the HAP contracts and, more specifically, the overall limitation contained in Section 1.9(d).

■ The rent adjustment provision of the HAP contracts between HUD and the project owners provides, in pertinent part:

1.9 *RENT ADJUSTMENTS*

* * * * * *

b. *Automatic Annual Adjustments.*

(1) [AAAFs] will be determined by the Government at least annually; interim revisions may be made as market conditions warrant. Such Factors and the basis for their determination will be published in the Federal Register. These published Factors will be reduced appropriately by the Government where utilities are paid directly by the Families.

(2) On each anniversary date of the Contract, the Contract Rents shall be adjusted by applying the applicable [AAAFs] most recently published by the Government. Contract Rents may be adjusted upward or downward, as may be appropriate; however, in no case shall the adjusted Contract Rents be less than the Contract Rents on the effective date of the Contract.

c. *Special Additional Adjustments.* Special additional adjustments shall be

granted, when approved by the Government, to reflect increases in the actual and necessary expenses of owning and maintaining the Contract Units which have resulted from substantial general increases in real property taxes, utility rates, or similar costs (i.e., assessments, and utilities not covered by regulated rates), but only if and to the extent that the Owner clearly demonstrates that such general increases have caused increases in the Owner's operating costs which are not adequately compensated for by automatic annual adjustments. The Owner shall submit to the Government financial statements which clearly support the increase.

d. *Overall Limitation.* Not withstanding any other provisions of this Contract, adjustments as provided in this Section shall not result in material differences between the rents charged for assisted and comparable unassisted units, as determined by the Government; provided, that this limitation shall not be construed to prohibit differences in rents between assisted and comparable unassisted units to the extent that such differences may have existed with respect to the initial Contract Rents.

Pursuant to the overall limitation in Section 1.9(d), HUD conducted studies for certain rental units covered under the HAP contracts to determine the rents charged for comparable unassisted units. When those studies indicated that a rent increase based on the applicable AAAFs under Section 1.9(b) would result in a Section 8 rent that materially exceeded the rents charged for comparable unassisted units, HUD took action to avoid such a material difference. In certain cases, HUD avoided the difference by not making any adjustment at all, and in other cases, HUD granted a lower increase than would have resulted from the grant of a full AAAF-based adjustment. In yet other instances, where comparability studies showed that the existing rent was already materially in excess of the rents charged for comparable unassisted units, HUD decreased the existing rent.

In *NLHA I,* 22 Cl.Ct. at 658–59, this court concluded that pursuant to the overall limitation in Section 1.9(d), HUD was not obliged to grant a rent adjustment based upon the applicable AAAFs when comparability studies demonstrated that such an adjustment would result in a rent materially above those rents charged for comparable unassisted units. In so interpreting Section 1.9(d), this court disagreed with the Court of Appeals for the Ninth Circuit's prior interpretation of this same provision in *Rainier View Assocs. v. United States,* 848 F.2d 988 (9th Cir.1988), *cert. denied,* 490 U.S. 1066, 109 S.Ct. 2065, 104 L.Ed.2d 630 (1989). After *NLHA I,* the Supreme Court reviewed the approach the Ninth Circuit had adopted in *Rainier View* and, employing essentially the same reasoning as this court had employed in *NLHA I,* rejected the *Rainier View* analysis. *Cisneros v. Alpine Ridge Group,* —— U.S. ——, 113 S.Ct. 1898, 123 L.Ed.2d 572 (1993). Because the Supreme Court has spoken on this issue, plaintiffs no longer dispute that the overall limitation authorizes HUD, in appropriate circumstances, either to grant a rent increase less than the full upward adjustment called for in the applicable AAAFs or to grant no increase at all. Plaintiffs contend, however, that where application of the AAAFs would result in increases in the contract rents, HUD can only limit or eliminate those increases and may not use comparability studies to decrease the existing contract rents. Defendant disagrees and contends that the overall limitation obliges HUD to lower the contract rents in such instances to eliminate material differences that may have resulted from adjustments in prior years.

### B.

Defendant's interpretation is correct. The overall limitation provision does not limit HUD's actions to the extent plaintiffs propose. The overall limitation contains no statement that HUD may decrease the contract rent only when the AAAFs are negative. To the contrary, the mandate in the overall limitation that adjustments under Section 1.9 "shall not result in material differences" is absolute and therefore refers to all adjustments granted under the rent adjustment provision, including prior year adjustments. To the extent that a decrease in the contract rent is necessary to assure that

prior year adjustments do not now result in a rent materially in excess of comparable rents, the overall limitation requires HUD to lower the contract rent to eliminate that difference.

Although *Alpine Ridge* did not address this precise point, the discussion therein of the Section 8 program and the overall limitation supports this court's interpretation. The rent adjustment provision in the HAP contracts implements Section 8(c)(2)(C) of the Housing Act,[6] which the Court in *Alpine Ridge* described as follows:

> [T]he Housing Act ... provides that "[a]djustments in the maximum rents," whether based on market surveys or on a reasonable formula, "shall not result in material differences" between Section 8 rents and the rents for comparable housing on the private market.

*Id.* at ——, 113 S.Ct. at 1903.

Plaintiffs' interpretation of the overall limitation would undermine Section 8(c)(2)(C) be-

cause it would oblige HUD to pay rents for Section 8 units that, as a result of prior year adjustments, are materially higher than rents charged for comparable unassisted units. For example, under plaintiffs' interpretation, where HUD's comparability studies reveal that prior year adjustments based on then-applicable AAAFs have resulted in rents materially higher than rents charged for comparable unassisted units, HUD would be obliged to continue to pay those above-market rents unless HUD calculated a negative AAAF which would eliminate the entire difference. But as explained in *NLHA I*, 22 Cl.Ct. at 662 & n. 10, forcing HUD to rely upon a modified AAAF rather than the overall limitation could add significant costs to HUD's implementation of Section 8 without any necessary countervailing benefits to either HUD or the project owners. Moreover, in *Alpine Ridge*, the Supreme Court rejected an analogous effort to interpret the rent adjustment provision in a way that would

---

**6.** Section 8(c)(2)(C) of the Housing Act provides:

> Adjustments in the maximum rents under subparagraphs (A) and (B) shall not result in material differences between the rents charged for assisted units and unassisted units of similar quality, type, and age in the same market area, as determined by the Secretary. In implementing the limitation established under the preceding sentence, the Secretary shall establish regulations for conducting comparability studies for projects where the Secretary has reason to believe that the application of the formula adjustments under subparagraph (A) would result in such material differences. The Secretary shall conduct such studies upon the request of any owner of any project, or as the Secretary determines to be appropriate by establishing, to the extent practicable, a modified annual adjustment factor for such market area, as the Secretary shall designate, that is geographically smaller than the applicable housing area used for the establishment of the annual adjustment factor under subparagraph (A). The Secretary shall establish such modified annual adjustment factor on the basis of the results of a study conducted by the Secretary of the rents charged, and any change in such rents over the previous year, for assisted units and unassisted units of similar quality, type, and age in the smaller market area. Where the Secretary determines that such modified annual adjustment factors cannot be established or that such factor when applied to a particular project would result in material differences between the rents charged for assisted units and unassisted units of similar

quality, type, and age in the same market area, the Secretary may apply an alternative methodology for conducting comparability studies in order to establish rents that are not materially different from rents charged for comparable unassisted units. If the Secretary or appropriate State agency does not complete and submit to the project owner a comparability study not later than 60 days before the anniversary date of the assistance contract under this section, the automatic annual adjustment factor shall be applied. The Secretary may not reduce the contract rents in effect on or after April 15, 1987, for newly constructed, substantially rehabilitated, or moderately rehabilitated projects assisted under this section (including projects assisted under this section as in effect prior to November 30, 1983), unless the project has been refinanced in a manner that reduces the periodic payments of the owner. Any maximum monthly rent that has been reduced by the Secretary after April 14, 1987, and prior to November 7, 1988, shall be restored to the maximum monthly rent in effect on April 15, 1987. For any project which has had its maximum monthly rents reduced after April 14, 1987, the Secretary shall make assistance payments (from amounts reserved for the original contract) to the owner of such project in an amount equal to the difference between the maximum monthly rents in effect on April 15, 1987, and the reduced maximum monthly rents, multiplied by the number of months that the reduced maximum monthly rents were in effect.

42 U.S.C. § 1437f(c)(2)(C).

require HUD to base rent adjustments on the AAAFs rather than on comparability studies. Rejecting the Ninth Circuit's analysis in *Rainier View*, the Supreme Court explained:

> In its *Rainier View* decision, the Court of Appeals read § 1.9d's "overall limitation" as empowering HUD only to make prospective changes in the automatic adjustment factors where it discovered that those factors were producing materially inflated rents; under the court's view, § 1.9d would not permit "abandonment of the formula method whenever application of the formula would result in a disparity between section 8 and other rents." 848 F.2d at 991. But this reading of the contract—under which Section 8 project owners could demand payment of materially inflated rents until the Secretary could publish revised automatic adjustment factors aimed at curing the overpayment—is almost precisely backwards. It would entitle project owners to collect the formula-based adjustments promised by § 1.9b *notwithstanding* that those adjustments were resulting in the sort of material differences in rents prohibited by § 1.9d.

*Alpine Ridge*, ⸺ U.S. at ⸺ ⸺, 113 S.Ct. at 1903–04. Here, as in *Alpine Ridge*, the project owners "demand payment of materially inflated rents until the Secretary could publish revised automatic adjustment factors aimed at curing the overpayment." Thus, as in *Alpine Ridge*, this court must reject plaintiffs' interpretation of the overall limitation as inconsistent with the wording of both the overall limitation and Section 8(c)(2)(C) of the Housing Act, which the overall limitation sought to implement.

### C.

Interpreting the overall limitation and Section 8(c)(2)(C) as expressing an overarching concern that Section 8 rents not be materially different from rents charged for comparable unassisted units would seem consistent with the parties' reasonable economic expectations when they entered the HAP contracts. If the project owners did not enter HAP contracts with HUD, they could expect to rent their units to tenants on the open market at rents approximating those charged

for comparable unassisted units. Similarly, if HUD, without the benefit of the HAP contracts, tried to find apartments for low-income families, HUD could expect to pay approximately market rents. Therefore, interpreting the overall limitation provision to require adjustment of the contract rents in order to eliminate any material difference between the rents charged for assisted and comparable unassisted units would be generally consistent with the reasonable expectations of both HUD and the project owners as to the value of the rented units. HUD and the project owners would both be assured that contract rents would not stray too far from market rents. HUD could expect to pay and the project owners could expect to receive rents not materially different from the rents charged for comparable units on the open market.

Moreover, this interpretation would not create any unreasonable burden on HUD or the project owners. Section 1.9 of the HAP contracts anticipates that rent adjustments ordinarily will be based on the AAAFs and that any adjustment based on comparability studies will be the exception. *Id.* at ⸺, 113 S.Ct. at 1904. This is so because the overall limitation does not prohibit every difference between rents charged for assisted and comparable unassisted units. The overall limitation proscribes only material differences, and since 1986, HUD has interpreted material differences according to a 1986 HUD memorandum which provides that "a material difference exists whenever the adjusted Section 8 rent would exceed 120 percent times the sum of the comparable rent and the initial difference." This approach appears to be a reasonable application of the overall limitation, *see Park Village Apartments v. United States*, 32 Fed.Cl. 441, 451–53 (1994), and therefore, given the 120 percent threshold, the overall limitation should apply only in exceptional circumstances.

### D.

To support their position that the overall limitation does not authorize HUD to decrease contract rents when the AAAFs are

positive, plaintiffs rely upon the legislative history of amendments to the Housing Act incorporated into the Housing and Community Development Act of 1987, Pub.L. No. 100–242, § 142, 101 Stat. 1815, 1850 (1988). The pertinent House Report provides, in relevant part:

> When it enacted the Sec. 8 program, Congress intended that rents for project-based assisted projects would be reduced only if the published Automatic Annual Adjustment Factor ("AAAF") was negative; reflecting a noticeable general downturn of rents in the market area. Although no negative adjustment factors have been published to date, HUD field offices have been making capricious individualized rent reductions nonetheless.... To eliminate these arbitrary practices not justified under current law, Sec. 142(d) [of the House bill] prohibits reductions in rents in effect on or after April 15, 1987, unless the project has been refinanced and the monthly mortgage payments have been reduced.

H.R. No. 122(I), 100th Cong., 1st Sess. 32 (1987), *reprinted in* 1987 U.S.C.C.A.N. 3317, 3348.

This legislative history is not sufficient for plaintiffs to prevail. First, the legislative history was not drafted when the pertinent language of Section 8 was enacted in 1974, but rather was produced 13 years later in connection with amendments to the Housing Act. As the Supreme Court recognized in *Pension Benefit Guaranty Corp. v. LTV Corp.*, 496 U.S. 633, 650, 110 S.Ct. 2668, 2678, 110 L.Ed.2d 579 (1990), "subsequent legislative history is a 'hazardous basis for inferring the intent of an earlier' Congress" (quoting *United States v. Price*, 361 U.S. 304, 313, 80 S.Ct. 326, 332, 4 L.Ed.2d 334 (1960)). *See also Weinberger v. Rossi*, 456 U.S. 25, 35, 102 S.Ct. 1510, 1518, 71 L.Ed.2d 715 (1982) ("[p]ost hoc statements of a congressional committee are not entitled to much weight"); *Oscar Mayer & Co. v. Evans*, 441 U.S. 750, 758, 99 S.Ct. 2066, 2072, 60 L.Ed.2d 609 (1979). Indeed, plaintiffs rely upon the report of a single committee in the 100th Congress which purports to describe the intent of the entire Congress 13 years earlier when Congress enacted Section 8 of the Housing Act. It would seem a virtually impossible task for a single committee to determine with any reasonable degree of certainty the unstated intent of the entire Congress 13 years prior.

Second, the wording of the legislative history suggests that the committee may have focused more on its own concerns in 1987 than on the intent of Congress in 1974. The House Report states that "[w]hen it enacted the [Section 8] program, Congress intended that rents for project-based assisted projects would be reduced only if the published [AAAF] was negative." Yet, the pertinent wording of Section 8 as enacted demonstrates no such intent. Section 8 provides that "[t]he assistance contract shall provide for adjustment annually or more frequently in the maximum monthly rents for units covered by the contract to reflect changes in the fair market rentals established in the housing area for similar types and sizes of dwelling units or, if the Secretary determines, on the basis of a reasonable formula." 42 U.S.C. § 1437f(c)(2)(A). Hence, Section 8 did not originally mandate HUD's use of any formula, much less an AAAF-based formula. HUD did not first propose to use AAAFs until after the enactment of Section 8 at the end of 1974. Moreover, the wording of Section 8 does not support the conclusion that Congress intended that contract rents never be decreased based on comparability determinations. One of the two alternatives available to HUD was to have rent adjustments "reflect changes in the fair market rentals," and when market rents go down, a decrease in Section 8 rents may be required to "reflect changes in the fair market rentals." Given the lack of support in the wording of the statute and the passage of time between the enactment of the statute and the legislative history upon which plaintiffs rely, the court will not interpret Section 8 as enacted in 1974 as having the meaning ascribed to it in the 1987 committee report.

## VI.

### A.

■ The next issue the court will address involves the proper interpretation of the pro-

viso in the overall limitation which states: "provided, that this limitation shall not be construed to prohibit differences in rents between assisted and comparable unassisted units to the extent that such differences may have existed with respect to initial Contract Rents." Plaintiffs contend that "the extent that such differences may have existed," referred to by the parties as the "initial difference," must be calculated as a fixed percentage. Thus, for example, if the original contract rent is $250 and rents charged for comparable unassisted units at the time is $200, plaintiffs contend that the initial difference is 25 percent. Defendant responds that the initial difference is a fixed dollar amount and hence, the initial difference in that situation is $50. Such a dispute becomes economically significant when rents increase substantially over time. For example, if the comparable rents in the situation hypothesized above rose from $200 to $500, adding the 25 percent initial difference would yield a rent of $625, and adding the $50 difference would yield a rent of $550.

Focusing exclusively on the wording of the proviso in the overall limitation, the court's initial reaction is that the phrase "the extent that ... differences [in rents] may have existed" refers to a dollar difference rather than a percentage difference. Rents ordinarily are stated in dollar amounts and a determination of the extent to which two rents differ ordinarily will involve a determination of the dollar difference between the rents. Unless the court is specifically asked to determine the *percentage* difference, the court would describe the difference between a $200 and a $250 rent as $50 and not as the second rent being 25 percent higher than the first or the first being 20 percent lower than the second.

This interpretation is consistent with the pertinent dictionary definitions. In the proviso in the overall limitation, the word "dif-

ference" is used as a mathematical term. *The American Heritage Dictionary* 395 (2nd ed. 1982), defines "difference" in pertinent part as follows: "Math. a. The amount [defined as "[a] number," *id.* at 103, which in turn is defined as a "positive integer," *id.* at 852] by which one quantity is greater or less than another. b. The amount that remains after one quantity is subtracted from another." Hence, unless further qualified, the "difference" is the number by which one quantity is greater or less than another or the number that remains after one quantity is subtracted from another. Herein, the number by which the initial contract rent exceeds a comparable rent and the number that remains when the comparable rent is subtracted from the contract rent would be a dollar amount rather than a percentage figure. The determination of a percentage difference would require an additional calculation after calculating the dollar difference. The dollar difference must be transformed into a percentage by dividing the dollar difference by the comparable rent. In other words, when one calculates the percentage difference, one calculates the percentage, not the number, by which one rent exceeds the other. Thus, the "difference" and the "percentage difference" are two distinct calculations, and where the difference in rents rather than the percentage difference is referenced, the difference should be expressed in dollars.[7]

### B.

Plaintiffs argue that when one looks beyond the wording of the proviso in the overall limitation and focuses on the other portions of the statute and on HUD's practice in establishing the initial difference, the parties' intent to carry forward the difference in rents as a percentage difference becomes apparent. As to the statute, Section 1437f(c)(1) provides that initial contract rents may not exceed fair market rents by more

7. Because "the extent [of] differences [in rents]" ordinarily refers to dollar differences, the court would expect that parties who intend that a difference be calculated as a percentage would so specify. Here, the parties did not. Indeed, in Section 1.9(b), the HAP contracts make clear that automatic annual adjustments are determined by applying factors, the AAAFs. (The AAAFs are factors because the AAAFs must be multiplied by the contract rents in order to arrive at the adjusted rents.) Plaintiffs analogously paint the "extent [of the rent] differences" as requiring the use of a factor, *i.e.*, a percentage, but Section 1.9(d) contains no equivalent indication that a factor is involved.

than 10 or 20 percent, depending upon the type of project.[8] But to state that the ceiling for contract rents is a certain percentage above fair market rents certainly is not to say that once the contract rents are set at a particular dollar amount below that ceiling, the difference between the contract rents and comparable rents should thereafter be calculated as a percentage difference.

Turning next to HUD's practice in establishing the initial difference, HUD has periodically published handbooks describing Section 8 program procedures, including the calculation of initial contract rents. Although the handbooks have changed over time, for at least a substantial period, HUD calculated the initial contract rents for many Section 8 units by making percentage adjustments to the rents charged for comparable unassisted units. For example, the HUD handbook in effect in 1976 granted the project owner up to three 5 percent upward adjustments to comparable rents to compensate, respectively, for (1) enhancement in rental values attributable to special amenities and design features included in elderly/handicapped units, (2) additional burdens of managing where 100 percent of the units are assisted, and (3) payment of mortgage discounts where HUD-insured financing is used or higher debt service payments where conventional financing is used.[9] Plaintiffs argue

---

8. Section 1437f(c)(1) provides, in pertinent part:

An assistance contract entered into pursuant to this section shall establish the maximum monthly rent (including utilities and all maintenance and management charges) which the owner is entitled to receive for each dwelling unit with respect to which such assistance payments are to be made. The maximum monthly rent shall not exceed by more than 10 per centum the fair market rental established by the Secretary periodically but not less than annually for existing or newly constructed rental dwelling units of various sizes and types in the market area suitable for occupancy by persons assisted under this section, except that the maximum monthly rent may exceed the fair market rental (A) by more than 10 but not more than 20 per centum where the Secretary determines that special circumstances warrant such higher maximum rent or that such higher rent is necessary to the implementation of a housing strategy as defined in section 12705 of this title. . . .

This 10 or 20 percent limit has been in effect since Section 8 was first enacted. *See* Housing and Community Development Act of 1974, Pub.L. No. 93–383, § 201, 88 Stat. 633, 663 (1974).

9. The HUD handbook effective in 1976 provided, in pertinent part:

i. *Special Adjustments*. The overall effect of the three adjustments described in subparagraphs (1), (2) and (3) below is to permit the approval of Contract Rents which exceed normal comparability. . . .

(1) An upward adjustment of 5% shall be made to reflect the enhancement in rental values attributable to the special amenities and design features included in Elderly/Handicapped Units. . . .

(2) If 100% of the revenue-producing dwelling units of a Section 8 project are planned to be assisted, an upward adjustment of 5% shall be made to compensate for the addi-

tional burdens of managing an all subsidized rental housing project. . . .

(3) An upward adjustment of 5% shall be made to compensate for the payment of mortgage discounts when HUD-insured financing is used or to compensate for the higher debt service payments that generally must be paid to obtain conventional mortgage loans when conventional mortgage loan financing is used. . . .

HUD Handbook 7420.1 CHG, ch. 9, at 9–13 to 9–14 (Nov. 1976).

The HUD handbook in effect in 1978 changed the percentages allowed but retained this basic structure, as follows:

(9–3i) *Special Adjustments to the Comparable Rent*

(1)(i) The following adjustment is intended to compensate for the increased security services and higher costs of owning and maintaining assisted *family* housing, and for both the additional management costs and costs for additional amenities and design features, such as ramps and grab bars, which are required in units planned for *elderly/handicapped* occupancy.

(a) For all assisted units in projects which are not HUD-insured, a 10% adjustment shall be made.

(b) For all assisted units in HUD-insured projects in which 100% of the revenue producing units are assisted, a 10% adjustment shall be made.

(c) For all units in HUD-insured projects in which fewer than 100% of the revenue producing units are assisted, a 5% adjustment shall be made.

* * * * *

(2) An upward adjustment of 5% shall be made to compensate for the payment of mortgage discounts when HUD-insured financing is used or to compensate for the higher debt service payments that generally must be paid to obtain conventional mortgage loans when conventional mortgage loan financing is used [subject to the conditions subsequently listed in

that because the difference in the two rents at the time HUD calculated the original contract rents often was based on a percentage adjustment, the parties reasonably must have envisioned that Section 1.9(d) of the HAP contracts would carry forward this methodology in the overall limitation determinations and would require calculation of the initial difference using a percentage adjustment to comparable rents. But the HAP contracts state the contract rent as a fixed dollar amount and not as a base rent plus a percentage. While HUD may have calculated initial contract rents by making percentage adjustments to the rents charged for comparable unassisted units, before those adjustments were translated into contract rents, the percentages were first transformed into a fixed dollar amount and that dollar amount was then added to the comparable rents to produce the contract rent. Therefore, simply because the parties anticipated that HUD may calculate initial contract rents by using percentage adjustments to comparable rents does not mean that the parties also anticipated that when applying the overall limitation, the initial difference between the contract rents and comparable rents would be a percentage difference rather than a dollar differ-

ence.[10] Hence, the various handbook provisions issued by HUD are consistent with the wording of Section 1.9(d) of the HAP contracts which, as described above, anticipates that the initial difference is a fixed dollar amount.

## C.

Next, plaintiffs argue that interpreting the initial difference as a flat dollar amount would improperly preclude plaintiffs from receiving compensation for reasonably foreseeable, inflation-related increases in the cost of operating Section 8 projects. As explained above, under the 1976 HUD Handbook, HUD granted adjustments to comparable rents of up to 15 percent to compensate project owners for the additional costs associated with operating Section 8 projects (the 1978 HUD Handbook granted similar adjustments up to 15 percent). Plaintiffs argue that the parties to the HAP contracts reasonably must have contemplated that at least some of these additional costs, such as certain of the costs associated with managing the Section 8 projects, could be expected to increase over time due to inflation. Accordingly, if the initial difference were maintained as a fixed dollar amount rather than a percentage, then the

---

(i), (ii), and (iii) in the full text of the handbook].... HUD Handbook 7420.1 CHG, ch. 9, at 9–13 (May 1978).

The HUD handbook effective in 1981 was revised to allow a 10 percent adjustment for all Section 8 projects subject to a "rent reasonableness" test. The 1981 handbook provided, in pertinent part:

k. *Limitation on Rents Including Cost Justification.* The rent reasonableness test in the previous revisions of this Handbook allowed reasonable rents in Section 8 projects to exceed rents for comparable unassisted units by up to 15 percent without cost justification of any kind ... and by an additional 5 percent with cost justification. Now, the reasonable rents may exceed comparable rents by up to 20 percent but where the owner's proposed rents exceed the comparable rents, an additional test of rent reasonableness must be made by the Section 8 Rent Formula for Assisted Units.... [T]he rent formula will limit the reasonable rent to that necessary to pay for vacancy, operating expenses and reserves, debt service on the mortgage, and for profit motivated owners, provide a 6% return to equity on projects for elderly families, or a 10% return to equity on projects for non-elderly families.

HUD Handbook 7420.1 REV–1, ch. 9, at 9–4 to 9–5 (Feb. 1981).

**10.** This conclusion is buttressed by the provision in certain of the HUD handbooks authorizing HUD to establish an initial contract rent that is greater than the rent resulting from application of the percentage adjustments when such a higher rent is proposed by the contractor and is determined by HUD to be "reasonable" though somewhat higher than HUD's estimates of comparability. *See, e.g.,* HUD Handbook 7420.1 CHG, ch. 9, at 9–13 (Nov. 1976). Where an initial contract rent is established based on such a determination that a proposed rent is "reasonable" and not by using a percentage calculation, there would seem to be no sound analytical basis for contending that the initial difference nevertheless should be calculated as a percentage. But if HAP contract holders whose initial contract rents were based on such a "reasonableness" determination are necessarily limited to a fixed dollar difference, then so too should HAP contract holders whose rents instead were calculated using percentage adjustments. It is not apparent why Congress or HUD would have intended to treat the two types of HAP contract holders differently and thereby discriminate so significantly against one class.

project owners would have no assurance that contract rents would keep up with inflation-related increases in these variable costs. Plaintiffs argue that it is not reasonable to interpret the proviso in the overall limitation as permitting such a diminution of the intended benefits of the special adjustments HUD provided.

Plaintiffs' argument has considerable initial appeal. The problem with this argument, however, is that it proves too much. To interpret the overall limitation "difference" as involving a 15 percent premium over rents of comparable unassisted units when all three 5 percent adjustments are allowed would permit a project owner not only to recover periodic rent increases to compensate for inflationary increases in its variable costs, but also potentially to recover increases with respect to fixed costs for operating the Section 8 project, costs which are incurred when the units are built or when certain features are added and do not rise with inflation. For example, HUD permitted one 5 percent adjustment "to reflect the enhancement in rental values attributable to the special amenities and design features included in Elderly/Handicapped Units." The costs of these amenities and design features, such as ramps, handrails, and wide hallways, are, for the most part, fixed at the time they are installed. HUD granted another 5 percent adjustment to account for mortgage discounts and debt service payments. Plaintiffs have acknowledged that such debt-related costs were fixed upon entry into the mortgage agreements and generally insulated from the effects of inflation. Thus, to permit plaintiffs to maintain the initial difference as a 15 percent factor could produce a windfall to plaintiffs as comparability rates increase. Such an interpretation of the initial difference could result in plaintiffs receiving rent increases that are neither justified by changes in the rental market (*i.e.*, comparability) nor by increases in plaintiffs' costs attendant to running the Section 8 projects.

These windfall payments could potentially be significant in amount.[11]

Thus, each of the two proposed interpretations of the initial difference in the overall limitation would produce results that can be argued to be inequitable. On the one hand, the initial difference was established to compensate project owners for certain costs and defendant's proposed interpretation fails to permit an increase in the dollar amount of the initial difference over time to reflect increases in certain costs that were foreseeable to the parties at the time they entered the HAP contracts. On the other hand, plaintiffs' proposed interpretation would compensate project owners for such anticipated increases in costs but could result in windfall profits to the project owners. Given the ambiguous nature of this choice from a housing policy perspective, plaintiffs simply have not presented any compelling reason to conclude that the parties intended the proviso in the overall limitation to be interpreted in a manner other than that consistent with its plain meaning which, as described above, is that the initial difference is a dollar amount rather than a percentage.

### Conclusion

For the reasons set forth above, (1) this court lacks jurisdiction to consider the claims presented by those plaintiffs that entered HAP contracts with the PHAs rather than directly with HUD, (2) the overall limitation provision contained in the HAP contracts permits HUD to use comparability studies to decrease contract rents to eliminate any material differences between rents charged for assisted and comparable unassisted units, and (3) the initial difference with respect to the initial contract rents is a fixed dollar amount rather than a percentage factor.

IT IS SO ORDERED.

---

11. An analogous windfall would result under the 1981 HUD Handbook which provides that the original contract rents should be established to provide the project owners with a specified return on equity (6 percent on projects for elderly families and 10 percent for nonelderly families). *See supra* note 9. If the initial difference is maintained as a percentage rather than as a fixed number, the return on equity could grow beyond the stated percentages.